# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS,
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Richard Brewer, Jean Carol Lane, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Ron Nirenberg, | § | |
| In His Official Capacity as | § | |
| Mayor of the City of San Antonio, and | § | Civil Action No. 5:17-cv-00837-DAE |
| Roberto Trevino, William Shaw, | § | |
| Rebecca Viagran, Rey Saldana, | § | |
| Shirley Gonzales, Greg Brockhouse, | § | |
| Ana Sandoval, Manny Pelaez, | § | |
| John Courage, and Clayton Perry, | § | |
| In Their Official Capacities as | § | |
| Members of the San Antonio | § | |
| City Council, | § | |
| Defendants. | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT, MOTION FOR DECLARATORY JUDGMENT, & MOTION FOR PRELIMINARY INJUNCTION

### A. PARTIES

1.      Plaintiff, Richard Brewer, is an individual, a citizen of the State

of Texas, a resident taxpayer of the City of San Antonio, and a descendant of

Confederate veterans.

2.     Plaintiff, Jean Carol Lane, is an individual, a citizen of the State of Texas, a resident taxpayer of the City of San Antonio, a descendant of Confederate veterans, and a citizen of the State of Texas.

3.     Plaintiff, Texas Division, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

4.     Defendant, Ron Nirenberg, is an officer of the City of San Antonio and is being sued in his official capacity.   He may be served by serving the Office of the Mayor.  *See* Fed. R. Civ. P. 4(j)(2)(A).

5.     Defendant, Roberto Trevino, is an officer of the City of San Antonio and is being sued in his official capacity.   He may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

6.     Defendant, William Shaw, is an officer of the City of San Antonio and is being sued in his official capacity.   He may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

7.     Defendant, Rebecca Viagran, is an officer of the City of San Antonio and is being sued in his official capacity.   She may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

8.     Defendant, Rey Saldana, is an officer of the City of San Antonio and is being sued in his official capacity.   He may be served by serving the Office of the City Council.  *See* Fed. R. Civ. P. 4(j)(2)(A).

9.    Defendant, Shirley Gonzales, is an officer of the City of San Antonio and is being sued in his official capacity.  She may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

10.    Defendant, Greg Brockhouse, is an officer of the City of San Antonio and is being sued in his official capacity.  He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

11.    Defendant, Ana Sandoval, is an officer of the City of San Antonio and is being sued in his official capacity.  She may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

12.    Defendant, Manny Pelaez, is an officer of the City of San Antonio and is being sued in his official capacity.  He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

13.    Defendant, John Courage, is an officer of the City of San Antonio and is being sued in his official capacity.  He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

14.    Defendant, Clayton Perry, is an officer of the City of San Antonio and is being sued in his official capacity.  He may be served by serving the Office of the City Council. *See* Fed. R. Civ. P. 4(j)(2)(A).

## B. JURISDICTION

15.    The Court has jurisdiction over the lawsuit, because the suit arises under Amendment I of the U.S. Constitution.  "Congress shall make no law . . . abridging the freedom of speech.". . .  28 U.S.C. § 1331.  *Gunn v.*

*Minton*, 133 S.Ct. 1059, 1064 (2013); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).

16.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' claims to title to the two cannon beside the Travis Park Monument, to title to the memorial artifacts in the foundation, as well as claims against the City's conversion of the cannon and artifacts, because plaintiffs' claims are so related to the claim within the Court's original jurisdiction that they form a common nucleus of operative fact in the same case or controversy under Article 3 of the U.S. Constitution.  The removal of the Travis Park Monument gives rise to the abridgment of the constitutional guarantee of free speech.  Since the state claims and the federal claim arise from the same nucleus of facts, the removal of the Monument, the removal of the cannon, and the removal of the memorial artifacts, supplemental jurisdiction over the state claim is proper.  *Exxon Mobil*, 545 U.S. at 558; *see City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 167 (1997).

17.    This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons who have been deprived of their civil rights under color of state law, and under 28 U.S.C. § 1331 and § 1343(a)(3)(4).  These provisions confer jurisdiction on this Court to adjudicate violations of federal civil-rights acts and applicable provisions of the U.S. Constitution.

18.    The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Remedies are available under 42 U.S.C. § 1983.

## C.  VENUE

19.    Venue is proper in this district under 28 U.S.C. § 1391(B)(2), because all of the events or omissions giving rise to these claims occurred in this district and because all of the property at issue is situated in this district.   The Confederate Monument in Travis Park, the cannon, and the memorial artifacts are or were located in this district, and defendants' actions occurred in this district.  Venue also lies under 28 U.S.C. § 1400(a), because defendant resides or may be found in this district.

## D.  FACTS

20.    On March 27, 1899, the San Antonio City Council gave the Confederate Daughters[1] "permission and [] a perpetual place in Travis Park to erect the Confederate Monument."  History of Confederate Monument in Travis Park.  Appendix 2-6.

21.    On June 4, 1899, the *San Antonio Sunday Light* reported that the foundation stone to the Travis Park Confederate Monument had been laid.  *Memorial Shaft*, San Antonio Sunday Light, June 4, 1899, at 1.  A capsule was laid within the stone that included "the Roster of the Barnard E. Bee lodge, several Confederate bills and coins, a Confederate flag bearing the

---

[1] The United Daughters of the Confederacy is the successor association to the Daughters of the Confederacy.

name of Jeff Davis with a wreath of violets, pressed flowers from Winnie Davis' coffin, the daily newspapers and an old testament given by J.E. Thomas, who was a prisoner in Alton, Ill., for 32 months." *Id.* The newspaper reports further that "The stone was declared well and truly laid and memorial articles were placed therein: amid patriotic airs." *Id.*

22.     On July 5, 1908, the Albert Sidney Johnston Camp, No. 144, of the United Confederate Veterans[2] recorded that the Mayor of San Antonio, the Hon. Bryan Callaghan,

> accepted two fields [pieces] from Lt. Col. Chas. N. Clark. U.S.A.[,] which had been presented to the City of San Antonio, Tex.[,] by the U.S. Congress, for the benefit of the Confederate Camp of this City, was received and ordered that Lt. Denny confer with His Honor as to the disposition of same. It was the consensus of the Camp[] that the ceremony attending the acceptance & placing of same, one on each side of the Confederate Veterans monument at Travis Park be left to Mrs. J.D. Guinn of D. of C.

Copies of Minutes of Albert Sidney Johnston Camp 144. Appendix 7-8.

23.     Ninety-one years later, on Monday, July 31, 2017, City Councilmen Roberto Trevino and William Shaw filed a memo with the council's Governance Committee to request a full council vote to remove the Travis-Park Confederate Monument. Scott Huddleston, *New Home May Be Sought for Confederate Statue*, San Antonio Express-News (July 31, 2017, 5:17 p.m.), http://www.mysanantonio.com/news/local/article/New-home-may-be-sought-for-Confederate-statue-11721508.php.     Subsequently,   the   City

_____

[2] The Sons of Confederate Veterans is the successor association to the United Confederate Veterans.

Council voted to remove the Travis-Park Confederate Monument.  Kelsey Bradshaw, *San Antonio Removes Confederate Statue in Travis Park*, San Antonio Express (September 1, 2017, 11:04 a.m.), http://www.mysanantonio.com/news/local/article/San-Antonio-removing-Confederate-statue-in-Travis-12165970.php.

24.    On Monday and Tuesday, September 1 and 2, 2017, the City removed the Travis-Park Confederate Monument, the SCV cannon, and the memorial artifacts.  Alex Zielinksi, *Travis Park's Confederate Monument Has Been Removed*, San Antonio Current (September 1, 2017, 10:28 a.m.), https://www.sacurrent.com/the-daily/archives/2017/09/01/travis-parks-confederate-monument-has-been-removed.

25.    Judge Ezra was explicit in his instructions to the City as to its removal of the Confederate Monument that the City was to remove the Monument intact and without damage to the Monument.  Transcript 21-26; Appendix 31-35.

26.    Mr. John McCammon, the President of the Confederate Cemetery Association of San Antonio and Lt. Commander of the Texas Division, Sons of Confederate Veterans, witnessed the removal of the Travis-Park Monument.  Affidavit; Appendix 37-38.  Mr. McCammon reported that he had serious concerns, because the workers used jackhammers to remove the Monument's base and likely damaged the artfully carved stones of the oldest work of public art in the city.  *Id.*  Further, the base contained a time

capsule that included Confederate currency, a historic Bible, a Confederate flag, and other items of value. *Id.*; *Sunday Light.* Plaintiffs have repeatedly asked the City to inspect the Confederate Monument and cannon for damage and to ascertain the condition of the time capsule with its valuable contents. Crane Letter; Appendix 39. The City has yet to respond to these reasonable requests to insure that the Monument is intact, per order of the Court, and that the cannon and memorial artifacts are still in the City's possession and undamaged.

## E. PLAINTIFFS' CLAIMS

### COUNT 1 – ABRIDGEMENT OF FREE SPEECH

27.    A bedrock principle of the First Amendment is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); U.S. Const. amend. I.; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.") (Scalia J., concurring).

28.    A significant exception to the right to free speech is found in the government-speech doctrine. *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 460 (2009). Here, the court held that a government actor "is entitled to say what it wishes and to select the views that it wants to express." *Id.* "The placement of a permanent monument in a public park is a

form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.*   The government-speech doctrine is an absolute defense to First-Amendment challenges, and an unwise one at that. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 571 (2005) (Souter, J., dissenting).   Unchecked expansion of the government-speech doctrine threatens to erode constitutional protections by allowing viewpoint discrimination in an increasingly wide range. *Developments in the Law— State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1293 (2010).

29.   One significant area of exemption from the government-speech doctrine is where government funds speech through subsidies in order to promote diversity.[3] The U.S. Supreme Court in its first government-speech case took pains to acknowledge that the government may not discriminate against government-subsidized activities solely on the basis of viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

30.   In like manner, the government cannot make viewpoint restrictions of speech, even in unprotected forms of speech, such as libel. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-84 (1992).

> [T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination

---

[3]   Another exemption, the Establishment-Clause exemption, is discussed in some detail in *Summum.* 555 U.S. at 460; *see* Scalia concurrence. *See also R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, n. 4 (1992). This exemption is not in controversy in this matter.

unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V.*, 505 U.S. at 383-84.

That would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.

*R.A.V.*, 505 U.S. at 384.[4]

31.    The prohibition against viewpoint discrimination holds true for government speech in a limited public forum. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995). "[W]hen the State is the speaker, it may make content-based choices. . . . We recognized that[,] when the government appropriates public funds to promote a particular policy of its own[,] it is entitled to say what it wishes." *Id.* "It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

[W]e reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to "aim at the suppression of dangerous ideas." (citations omitted).

---

[4]    Justice White asserts that the prohibition against government burdening of speech content critical of government is not a First Amendment consequence, but rather a consequence of the Equal Protection Clause. *R.A.V.*, 505 U.S. at n. 4.

*Rosenberger*, 515 U.S. at 834.  In other words, when the government provides subsidies to support diversity of viewpoint, the government must maintain viewpoint neutrality in the provision of such subsidies.

32.    The prohibition on viewpoint discrimination serves to bar the government from skewing public debate.  *Id.* at 894.  (Souter, J., dissenting). "It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content." *Id.* at 895.

33.    The *Rosenberger* court concerns itself with the prohibition of viewpoint discrimination in government speech in a limited public forum.  *Id.* at 819.  *National Endowment of Arts v. Finley* inquires into the prohibition of viewpoint discrimination in government speech in a government forum.  524 U.S. 569 (1998).[5]

34.    A government actor in a government forum, such as the National Endowment for the Arts (NEA), may not leverage its power to award subsidies by subjective criteria to penalize disfavored viewpoints.  *Id.* at 587-88.   Indeed, works of art are unquestionably shielded by First Amendment protection.  *Id.* at 602.  (Souter, J., dissenting).

> The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political,

---

[5]  *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460 (2009) does not inquire into subsidies in relation to government speech, nor into the requirement that the government may not provide subsidies to promote diversity of viewpoint in any forum and exercise viewpoint discrimination.

but simply on their expressive character, which falls within a spectrum of protected speech extending outward from the core of overtly political declarations.  Put differently, art is entitled to full protection because our "cultural life," just like our native politics, "rest upon [the] ideal" of governmental viewpoint neutrality.

*National Endowment for the Arts*, 524 U.S. at 602-03.

35.   Government may not discriminate on viewpoint, when government expends funds to encourage diversity of viewpoint from private speakers.  *Id.* at 613  (quoting *Rosenberger*, 515 U.S. at 834).  "When the government acts as patron, subsidizing expression of others, it may not prefer one lawfully stated view over another."  *Id.*

So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values.  It may not use the NEA's purse to "suppress dangerous ideas."

*National Endowment for the Arts*, 524 U.S. at 613-14 (quoting *Regan v. Taxation with Representation for Wash.*, 461 U.S. 540, 548 (1983)).

36.   The City of San Antonio's Public Art Program, Public Art San Antonio (PASA), has published its Policy and Guidelines for Public Art. GETCREATIVESANANTONIO.COM,

http://www.getcreativesanantonio.com/Public-Art/Policy-Guidelines   (last visited September 29, 2017).  PASA specifically seeks through its ten-part guidelines "to select experienced artists who represent the diverse cultural landscape of San Antonio and to encourage the design enhancements that are

accessible to the public and respects the historical resources and mobility of the citizenry." *Id.*

37.    PASA has published its four values in its master plan.  Public Art San Antonio, GETCREATIVESANANTONIO.COM at 8-12, http://www.getcreativesanantonio.com/Portals/3/Files/DCCD-PASA/PASA%20MASTER%20PLAN%202008-06-10%20for%20web-small.pdf (last visited September 29, 2017).   PASA's first value is to "Share Stories." *Id.*

> All [stories] contribute to San Antonio's unique identity.  By drawing on these unique stories through public art, the city can reveal what is hidden and recall what is forgotten.  This is important because, as writer John Philip Santos says, "At the founding of many American cities lurk unsavory tales of invasion and mayhem, usually whitewashed or forgotten. Whether it's the hoary presence of old buildings or a nebula of run-down shacks and other ruins, the evidence of the past – raw, weathered, and scarred – raises accusatory questions.  How did this all come about?  What price was paid, by whom, and for whose sake?  Who was here before the whole story began? Troubled by the wraiths of American history, our cities have been bled by the suburbs and washed in the waters of urban renewal.". . .

Public Art San Antonio Master Plan at 9.   The City expressly embraces diversity of thought and experience, and in particular "unsavory" history in its master plan for public art.  PASA has defined "Diversity in culture and art" as a significant and important characteristic of its planning process. *Id.* at 20.

38.    The City subsidizes existing and planned public art through an extensive master plan that uses diversity as a core value for public art. *Id.* at 25-39.

39.    Mayor Nirenberg has publicly stated that Confederate memorials glorify slavery and a war against the United States to preserve slavery.  Joey Palacios, *Should the Travis Park Confederate Monument Be Relocated?*, TEXASSTANDARD.ORG,          (July          24,          2017,          10:59          a.m.), https://www.texasstandard.org/stories/categories/texas-public-radio/should-the-travis-park-confederate-monument-be-relocated/.          City          Councilmen Roberto Trevino and Cruz Shaw stated "Our public spaces should not be dedicated to symbols of power that honor an ideology which regarded black Americans    as    property." *Councilman    Roberto    Trevino    Reflects    on Community    Conversation    Surrounding    Confederate    Monument*, SANANTONIO.GOV                    (July                    6,                    2017), https://www.sanantonio.gov/Commpa/News/ArtMID/1970/ArticleID/10901/Councilman-Roberto-Trevi241o-reflects-on-community-conversation-surrounding-Confederate-monument.    The mayor and city councilmen removed the Travis Park Monument solely because defendants disfavored the political speech they impute to the Monument.

40.    The City is exercising viewpoint discrimination against the City's oldest work of public art that the City has been subsidizing for 118 years.

41.     The First Amendment presumptively restrains viewpoint discrimination by a state actor. *National Endowment*, 524 U.S. at 616; *Simon & Schuster, Inc. v. Members of New York State Crime Victim Bd.*, 502 U.S. 105, 116 (1991).  Since the presumption favors First-Amendment rights, the City has the burden to explain how the Monument communicates these imputed messages that are so remote from the Monument founders' published statements. *National Endowment*, 524 U.S. at 616.

42.     But even if the Mayor and City Council are correct in their understanding as to the controversial and repugnant political messages that these works of public art communicate, the City is prohibited from disfavoring or impairing minority political viewpoints that they have subsidized and called forth through the City's master plan for diversity in public art. *Id.* at 613-14; *see also Regan,* 461 U.S. at 548.  The core constitutional issue as to why a state actor may not favor some political viewpoints over others when the actor has subsidized and requested a diversity of viewpoints is that the state has opened the door to diversity of political discussion and cannot thereafter favor or disfavor one political viewpoint over another, especially when the state actor has agreed to display the controversial viewpoint for over a century.   Indeed, the City must affirmatively protect dangerous or dissenting viewpoints in the City's public art and has agreed to do so in its master plan as a core value.  Policy and Guidelines; Public Art San Antonio 8-12.  This protection is particularly

demanded in works of public art that the City subsidizes to express disfavored and outrageous viewpoints, such as the City imputes to the Confederate Monument. *Id.*

43.    The unchecked expansion of the government-speech doctrine into the realm of public art, expressly subsidized to project diversity of expression and viewpoint, chills free speech when the City picks which viewpoints it will tolerate and which not.   And this is even more true when the City strikes down dissenting minority speech for political viewpoint.   The Court should strike down the City's unchecked and unconstitutional expansion of government-speech into state-subsidized fora celebrating diversity of viewpoint and in public works of art in order to prevent the City's Orwellian control of traditional areas of free thought and expression.

### COUNT 2 – TITLE TO THE CANNON IN TRAVIS PARK RESTS IN THE SONS OF CONFEDERATE VETERANS, AND THE CITY CONVERTED THE CANNON AND THE TIME CAPSULE WHEN THE CITY REMOVED THE MONUMENT.

44.    The City accepted the two artillery field pieces for the Confederate Camp of San Antonio.   Appendix 7-8.   The Camp decided the disposition of the two field pieces.   *Id.*   The Camp decided to place the field pieces, one on each side of the Confederate Veterans Monument in Travis Park.   *Id.*   The cannon have stood in Travis Park, beside the Monument for the last 110 years.   *Id.*

45.    When the City removed the cannon and the time capsule in the foundation stone, the City and its agents tortiously converted the objects.

> Tortious conversion is the wrongful possession or disposition of another's property as if it were one's own; an act or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property.

Black's Law Dictionary 406 (10th ed. 2014).

> [Tortious conversion] does not include mere acts of damage, or even an asportation which does not amount to a denial of the owner's right of property, but it does include such acts as taking possession, refusing to give up on demand, disposing of the goods to a third person, or destroying them.

Black's Law Dictionary 406 (10th ed. 2014) (quoting William Geldart, *Introduction to English Law* 143 (D.C.M. Yardley ed., 9th ed. 1984)).

46.  The City tortiously converted the field pieces, because title to the pieces resided in the SCV, the successor association of the United Confederate Veterans (UCV), when the City removed the cannon.  Indeed, the City Council voted to remove the Monument, not the cannon, and the cannon should have either remained in Travis Park or have been returned to the SCV.  The cannon were placed beside the Monument eight years after the Monument's erection and had an entirely separate provenance than the Monument.

47.  The City placed the cannon beside the Travis Park Monument at the direction of the UCV in 1907, after the UCV received the cannon as a gift from the U.S. Congress to Confederate veterans of San Antonio.  Appendix 7-8.  Currently, the City has asported the SCV's cannon and refused to allow plaintiffs to examine the cannon or the time capsule in the Monument's base.

This refusal alone constitutes tortious conversion of plaintiffs' property.

48.    The City has not responded to plaintiffs' requests to inspect not only the cannon, and the time capsule, but also the Monument itself. Appendix 39. McCammon has sworn that he has serious concerns that the City's work crew likely caused damage to the Monument in violation of the Court's order to keep the Monument intact.   Appendix 31-35, 37-38   The City's silence on plaintiffs' requests to inspect the Monument for damage raises further concerns that the City be seeking to repair damage to the Monument and to evade discovery that the City lost or destroyed the time capsule with its valuable and historic contents.

49.    The City's conversion of the cannon and memorial artifacts, its refusal to communicate with plaintiffs about the Confederate memorial artifacts, and the likely damage to the Monument in violation of Court order causes plaintiffs grave concerns as to the City's lack of candor and tortious conduct in this matter.

### F. REQUEST FOR PRELIMINARY INJUNCTION

50.    An affidavit that proves the allegations in the application for injunctive relief is attached and incorporated by reference.

51.    Plaintiffs will likely suffer irreparable injury, if the defendants are not restrained from further damaging, destroying, or disposing of the Travis-Park Confederate Monument, the SCV cannon, or the memorial artifacts. Fed. R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.,* 555

U.S. 7, 22 (2008).   Mr. John McCammon reports that the City broke the Monument's foundation stone apart using jackhammers.   Appendix 37-38.   A contemporaneous news report details the valuable articles placed in the foundation stone. *San Antonio Daily Light.*   Plaintiffs' counsel has requested to view the monument, including the cannon, and the memorial articles. Appendix 39.   The City has refused to answer, which leads plaintiffs and plaintiffs' counsel to assume the worst:   that defendants have damaged and perhaps even destroyed the engraved Monument stones, and have tortiously converted the cannon and the memorial artifacts secured by members of the United Confederate Veterans in the foundation stone 118 years ago.

52.    Plaintiffs are currently suffering on-going, irreparable injury, because defendants have removed the Confederate Monument and terminated the minority political speech that the Monument communicates. Fed. R. Civ. P. 65(b)(1); *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008).   "The loss of First Amendment interests were either threatened or in fact being impaired at the time relief was sought.   The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

53.    Mayor Nirenberg has said that the Confederate Monument should be "placed in a proper context."   Kelsey Bradshaw, *S.A. Mayor Wants to Place Confederate Symbols in "A Proper Context,"* San Antonio Express-News (August 15, 2017, 2:57 p.m.),

http://www.mysanantonio.com/news/local/article/S-A-Mayor-plans-to-place-Confederate-symbols-in-11820240.php. Mayor Nirenberg is a state actor who is ordaining the political viewpoint of public art subsidized by the City to promote diversity of viewpoint. The City's erroneous imputation of political viewpoint in public art subsidized to express diversity of viewpoint and then the City's subsequent suppression of the imputed political viewpoint violated plaintiffs' rights to free speech and constitutes on-going, irreparable harm. *Elrod*, 427 U.S. at 373.

54.     There is no adequate remedy at law, because any legal remedy would be merely illusory. *Northern Cal. Power Agency v. Grace Geothermal Corp.,* 469 U.S. 1306, 1306 (1984). The denial of free speech on a continuing basis cannot be readily reduced to monetary damages. The only adequate remedy to the abridgment of free speech is the injunctive demand to resume the abridged free speech.

55.     There is a substantial likelihood that the plaintiffs will prevail on the merits. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). The City has abridged plaintiffs' political speech by removing the Confederate Monument in order to substitute its own government-controlled viewpoint of political and artistic communication. Case law on this issue clearly supports the constitutional guarantee that the City may not force its own fleeting viewpoint on plaintiffs where the City has subsidized public art for diversity of political viewpoint. In addition, the claim for the SCV cannon and the

memorial articles provided by Confederate veterans is on all fours. The claim for conversion has a substantial likelihood of success, because the contemporaneous documents, created in the ordinary course of business and in news reporting, support the conclusion that the cannon were given for the benefit and control of the United Confederate Veterans and that these Veterans provided valuable memorial artifacts that the City has asportated and refused access to.

56.    The harm to plaintiffs outweighs the harm that a preliminary injunction would inflict on defendants. *Winter*, 555 U.S. at 24; *Yakus v. United States*, 321 U.S. 414, 440 (1944). Plaintiffs are already experiencing on-going, irreparable harm by the denial of political speech communicated by the Monument. *Elrod*, 427 U.S. at 373. Plaintiffs would have some cost to replace the Monuments and cannon, but the harm to the City is at the City's own hands, because City officers failed to consider the legal consequences of denying plaintiffs their constitutional right to political viewpoint in publicly subsidized public art and in asportating property without clear title and without seeking to ascertain title over property. Moreover, the requirement to reinstall the Monument would send a cautionary message to all state actors that they may not deny plaintiffs, a Texas-wide association, their constitutional rights to dissenting political speech subsidized in public art where diversity of opinion and expression is explicitly sought.

57.    Issuance of a preliminary injunction would not adversely effect the public interest and public policy, because issuance of the order would serve the public interest. *See Winter*, 555 U.S. at 24-26; *Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362-63 (Fed. Cir. 2008). Indeed, the benefit to third parties would be inestimable, as the termination of the City's abridgment of political viewpoint by removal of the Monument cannot be undervalued. The Court's order would mark the end of the City's Orwellian control of political viewpoint in publicly subsidized public art to express diversity of viewpoint. Free peoples are free by virtue of their freedom of thought and expression. James Madison writes that protection of diversity of political thought is the first purpose of government. The Federalist No. 10.[6] The Court would affirmatively advance public policy by enforcing one of the cornerstones of Republican government:  the City may not dictate political viewpoints in public art that the City subsidizes to express diversity of viewpoint.

58.    One of the first steps that totalitarian dictators take in assuming power is to control the means of public expression in public art in order to suppress dissenting political viewpoints, both of current and historic viewpoints. The Court's injunction against the City's plan to control political speech will restore fundamental constitutional guarantees that the City has joyfully abridged. If there is one principle that the Civil War and the Ku

---

[6] "The diversity in the faculties of men, from which the rights of property originate, is not less an insuperable obstacle to a uniformity of interests. The protection of these faculties is the first object of government." The Federalist No. 10 (James Madison).

Klux Klan Act resolved, it was that federal constitutional protections can not be ignored by local authorities.  The affirmation of this principle will serve the public interest in ways that can only be positive and will likely have far greater effect than any one in this matter can predict this day.

59.    Plaintiffs are willing to post a bond in the amount the Court deems appropriate.  However, plaintiffs are filing this cause in the public interest and request that the Court order no or a nominal bond.  *Kaepa, Inc., v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  Firstly, defendant stands in no financial risk by the issuance of the requested injunction.  And secondly, plaintiffs are suing in the public interest and stand to recover no damages in this action.

60.    Plaintiffs ask the Court to set the request for a preliminary injunction hearing at the earliest possible time.

## G. ATTORNEYS' FEES AND COSTS

61.    Plaintiffs are entitled to an award of attorney fees and costs under 28 U.S.C. § 1988.

## K. PRAYER

62.    For these reasons, plaintiffs ask that the Court do the following:

a.    Enter a preliminary injunction against defendants that they may not further alter, damage, destroy, carry away, or impair the Travis-Park Confederate Monument, the

SCV cannon formerly beside the Monument, and the memorial artifacts from their current location;

b.  Enter an order that defendants allow plaintiffs or plaintiffs' agents to inspect the Travis Park Confederate Monument, the SCV cannon, and the memorial artifacts;

c.  Enter a declaratory judgment that defendants' action in removing the Travis Park Monument and the SCV cannon violated plaintiffs' constitutional right to freedom of speech, guaranteed in the First Amendment to the U.S. Constitution;

d.  Order specific performance against defendants that defendants must repair and replace the Travis-Park Monument and the SCV cannon to their original and perpetual site in Travis Park;

e.  Enter declaratory judgment that the Sons of Confederate Veterans have legal title free and clear in the cannon and the memorial artifacts described in the *San Antonio Sunday Light*;

f.  Enter judgment for plaintiffs;

g.  Award attorney costs to plaintiffs;

h.  Award costs of suit to plaintiffs; and,

i.  Grant any other relief the Court deems appropriate.

Respectfully submitted this 3rd day of October 2017.

Respectfully submitted,

By: /s KIRK DAVID LYONS
Texas Bar No. 12743500
P.O. Box 1235
Black Mountain, N.C. 28711
E-mail kdl@slrc-csa.org
Tel. (828) 669-5189
Fax (828) 669-5191

## CERTIFICATE OF SERVICE

I certify that on October 3, 2017, a copy of Plaintiffs' First Amended Complaint, Motion for Declaratory Judgment, and Motion for Preliminary Injunction was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorney in charge for defendants, Ron Nirenberg, et al.

Deborah Lynne Klein
Office of the City Attorney
111 Soledad Street, 10th Floor
San Antonio, Texas 78205
Tel. (210) 207-7355

/s KIRK DAVID LYONS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS,
## SAN ANTONIO DIVISION

| | |
|---|---|
| Richard Brewer, Jean Carol Lane, §<br>And the Texas Division, §<br>Sons of Confederate Veterans, Inc., §<br>Plaintiffs, §<br> §<br>v.  §<br> §<br>Ron Nirenberg, §<br>In His Official Capacity as §<br>Mayor of the City of San Antonio, and §<br>Roberto Trevino, William Shaw, §<br>Rebecca Viagran, Rey Saldana, §<br>Shirley Gonzales, Greg Brockhouse, §<br>Ana Sandoval, Manny Pelaez, §<br>John Courage, and Clayton Perry, §<br>In Their Official Capacities as §<br>Members of the San Antonio §<br>City Council, §<br>Defendants. § | Civil Action No. 5:17-cv-00837-DAE |

## PLAINTIFFS' AFFIDAVIT TO FIRST AMENDED COMPLAINT, MOTION FOR DECLARATORY JUDGMENT, & MOTION FOR PRELIMINARY INJUNCTION

| | |
|---|---|
| STATE OF NORTH CAROLINA | §<br>§ |
| BUNCOMBE COUNTY | § |

## AFFIDAVIT OF KIRK DAVID LYONS

Before me, the undersigned notary, on this day personally appeared Kirk David Lyons, affiant, a person whose identity is known to me. After I administered an oath, affiant testified as follows:

1.      "My name is Kirk David Lyons.  I am competent to make this affidavit.  The facts stated in this complaint are within my personal knowledge and are true and correct.

2.      I have been reading news articles, talking with witnesses, and reading statements made by the parties in this matter."

KIRK DAVID LYONS

SWORN TO and SUBSCRIBED before me by Kirk David Lyons on October 3, 2017.

CHARLEEN TINSLEY
NOTARY PUBLIC
Burke County
North Carolina
My Commission Expires July 24, 2021

Notary Public in and for
The State of North Carolina