## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS,
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Richard Brewer, Jean Carol Lane, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Ron Nirenberg, | § | |
| In His Official Capacity as | § | |
| Mayor of the City of San Antonio, and | § | Civil Action No. 5:17-cv-00837-DAE |
| Roberto Trevino, William Shaw, | § | |
| Rebecca Viagran, Rey Saldana, | § | |
| Shirley Gonzales, Greg Brockhouse, | § | |
| Ana Sandoval, Manny Pelaez, | § | |
| John Courage, and Clayton Perry, | § | |
| In Their Official Capacities as | § | |
| Members of the San Antonio | § | |
| City Council, | § | |
| Defendants. | § | |

## APPENDIX
### to
### PLAINTIFFS' FIRST AMENDED COMPLAINT,
### MOTION FOR DECLARATORY JUDGMENT, &
### MOTION FOR PRELIMINARY INJUNCTION

/s KIRK DAVID LYONS
Texas Bar No. 12743500
P.O. Box 1235
Black Mountain, N.C. 28711
E-mail kdl@slrc-csa.org
Tel. (828) 669-5189
Fax (828) 669-5191
ATTORNEY FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS,
## SAN ANTONIO DIVISION

| | |
|---|---|
| Richard Brewer, Jean Carol Lane, § | |
| And the Texas Division, § | |
| Sons of Confederate Veterans, Inc., § | |
| Plaintiffs, § | |
| § | |
| v. § | |
| § | |
| Ron Nirenberg, § | |
| In His Official Capacity as § | |
| Mayor of the City of San Antonio, and § | Civil Action No. 5:17-cv-00837-DAE |
| Roberto Trevino, William Shaw, § | |
| Rebecca Viagran, Rey Saldana, § | |
| Shirley Gonzales, Greg Brockhouse, § | |
| Ana Sandoval, Manny Pelaez, § | |
| John Courage, and Clayton Perry, § | |
| In Their Official Capacities as § | |
| Members of the San Antonio § | |
| City Council, § | |
| Defendants. § | |

## APPENDIX
### to
## PLAINTIFFS' FIRST AMENDED COMPLAINT,
## MOTION FOR DECLARATORY JUDGMENT, &
## MOTION FOR PRELIMINARY INJUNCTION

/s KIRK DAVID LYONS
Texas Bar No. 12743500
P.O. Box 1235
Black Mountain, N.C. 28711
E-mail kdl@slrc-csa.org
Tel. (828) 669-5189
Fax (828) 669-5191
ATTORNEY FOR PLAINTIFFS



HISTORY OF CONFEDERATE MONUMENT IN TRAVIS PARK

Located in downtown San Antonio, Bexar Co., Texas

Written by Mrs. Fred Oldom of San Antonio, Texas

(Information was taken from the records of BARNARD E. BEE CHAPTER
NO. 86, United Daughters of the Confederacy.)

During the summer of 1894, Mrs. A. J. ALLENSWORTH and MRS. WILLIAM H. YOUNG organized a Chapter of the UNITED DAUGHTERS OF THE CONFEDERACY. Charter was granted on October 6, 1895, and was named BARNARD E. BEE NO. 86 in honor of Brigadier General BARNARD ELLIOTT BEE, who was killed in the Battle of Manassas July 21, 1861. His father, BARNARD E. BEE, SR. moved to Texas in 1835, after the Texas Revolution, and became Secretary of State, Republic of Texas. The BEE Family was prominent in San Antonio. Bee County and city of Beeville were named in honor of the family.

The objects of the United Daughters of the Confederate were: Memorial, Historical, Benevolent, Educational and Patriotic.

Charter members under the leadership of their first elected President, MRS. A. W. HOUSTON, began plans to erect San Antonio's first historical monument.

The Ladies were:

MRS. A. J. ALLENSWORTH
MISS FANNIE APPLEWHITE
MISS MAE BAUGH
MRS. W. F. BAUGH
MISS EMILY BEAUREGARD
MRS. HAMPTON P. BEE
MRS. KATIE CAMPBELL
MISS ALICE LEE KING
MISS MARY KING

MRS. ERNESTINE G. KROEGER
MISS LAURA A. KROEGER
MRS. MARY LOUISE MADDOX
MISS ANNA D. MACRUDER
MRS. J. B. MAGRUDER
MISS LIZZIE MAGRUDER
MISS MARY E. MAGRUDER
MISS MARY MAVERICK
MISS SARAH MAVERICK
MISS S. J. MAY

MISS LENORA MITCHELL
MISS LAURA MUSSEY
MISS MABEL MUSSEY
MRS. L. H. MOSS
MISS ANNA M. SCHAEFER
MRS. W. C. SILLIMAN
MISS EMMA E. WESCOTT
MISS FANNIE E. WESCOTT
MRS. E. M. WINSTEAD

Regular meeting of the City Council, City of San Antonio, met in session Monday, March 27, 1899. Present were:

MAYOR MARSHALL HICKS   and ALDERMEN:
ALEXANDER     LAMM             O'CONNOR
BARKER        MAHNCKE          PIPER        RICHTER
DAVIS         MUMME            RHEINER      SURKEY   and
                                            THIELE

The Council granted permission and gave a perpetual place in Travis Park to erect the Confederate Monument.

The design was drawn by a distinguished New Orleans artist, MISS VIRGINIA MONTGOMERY, whose mother was a member of the U.D.C. The stonework was done by FRANK TEICH, material being gray granite from the Llano quarries. Figure of the soldier with gun at rest and arm raised to Heaven is symbolic of faith in the Lost Cause, the ivy wreath typifying the Glory of heroic Service.

Three Thousand dollars that financed the Monument was acquired by giving teas, dinners, musical and dramatic performances. The Corner Stone was laid on June 3, 1899, and unveiled the following April. JUDGE JOHN H. REAGAN, who had been Postmaster General in the Confederate Cabinet, was guest speaker. Eloquent addresses were also made by the HON. MARSHALL HICKS, Mayor of San Antonio, and by JUDGE COLUMBUS UPSON, a veteran of the Confederate Army.

Two cannon flank the site of this monument. They were used in the Battle at Glorieta Pass, New Mexico, during the War Between the States (1861-1865). At the end of the war, they were kept buried; after it was safe they were unearthed by MAJOR TREVANION T. TEEL, Commander of TEEL'S Battery. MAJ. TEEL was grandfather of MRS. J. H. HEHNING of San Antonio. They were brought to Texas and donated to be placed in Travis Park by MAJ. TEEL.

From the Telegraph and Texas Register, Aug. 18, 1838.

ESTRAY NOTICE. Taken up by DAVID RANDON and appraised before Wm. WALKER, J.P., a black roan horse six years old, 14½ hands high, star in the forehead, left hind foot white, valued at $175.00. Fort Bend County, August 6.
                                                            JOSEPH H. BARNARD, County Clerk



...the objects of the United Daughters of the Confederacy were; Memorial, Histor-

cal, Benevolent, Educational and Patriotic.

Charter members under the leadership of their first elected President, MRS. A. W. HOUSTON, began plans to erect San Antonio's first historical monument.

The Ladies were:

| | | |
|---|---|---|
| MRS. A. J. ALLENSWORTH | MRS. ERNESTINE C. KROEGER | MISS LENORA MITCHELL |
| MISS FANNIE APPLEWHITE | MISS LAURA A. KROEGER | MISS LAURA MUSSEY |
| MISS MAE BAUGH | MRS. MARY LOUISE MADDOX | MISS MABEL MUSSEY |
| MISS W. P. BAUGH | MISS ANNA D. MAGRUDER | MRS. L. H. NOSS |
| MISS EMILY BEAUREGARD | MRS. J. B. MAGRUDER | MISS ANNA M. SCHAEFER |
| MRS. HAMPTON P. BEE | MISS LIZZIE MAGRUDER | MRS. W. C. SILLIMAN |
| MISS KATIE CAMPBELL | MISS MARY E. MAGRUDER | MISS EMMA E. WESCOTT |
| MISS ALICE LEE KING | MISS MARY MAGRUDER | MISS FANNIE E. WESCOTT |
| MISS MARY KING | MISS SARAH MAVERICK | MRS. E. M. WINSTEAD |
| | MISS MARY MAVERICK | |
| | MISS S. J. MAY | |

March 27, 1899. Regular meeting of the City Council, City of San Antonio, met in session Monday. Present were:

MAYOR MARSHALL HICKS     and ALDERMEN:

| | | |
|---|---|---|
| ALEXANDER | LAMM | O'CONNOR | RICHTER |
| BARKER | MAHNCKE | PIPER | SURKEY   and |
| DAVIS | MUMME | RHEINER | THIELE |

The Council granted permission and gave a perpetual place in Travis Park to erect the Confederate Monument.

The design was drawn by a distinguished New Orleans artist, MISS VIRGINIA MONTGOMERY, whose mother was a member of the U.D.C. The stonework was done by FRANK TEICH, material being gray granite from the Llano quarries. Figure of the soldier with gun at rest and arm raised to Heaven is symbolic of faith in the Lost Cause, the ivy wreath typifying the Glory of heroic Service.

Three Thousand dollars that financed the Monument was acquired by giving teas, dinners, musical and dramatic performances. The Corner Stone was laid on June 3, 1899, and unveiled the following April. ... JUDGE JOHN H. REAGAN, who had been Postmaster...

# Copies of Minutes of

# Albert Sydney Johnston Camp 144

## United Confederate Veterans
## San Antonio, Texas

## 1893 - 1926

Major Warner D. Farr, M.D.
Noralyn Ann Page
Jane Alberthal
Dena Brown
...for their enduring devotion to
the preservation of historical documents.

Copyright 1993
Do not copy without written permission from:

Jane Alberthal
U.D.C. Museum Committee
2115 Leal
San Antonio, Tx. 78207-2040

Belongs to Bob & Dena Brown

11



5



600

on expense account to Birmingham re-union – Grant
Com. Sloan reported that $200.00 had been paid to him
by        Arnold – Trustee of the Estate of Losselier
in conformity with a Will made by said Losselier
deceased to Albert Sidney Johnston Camp # 144 U.C.V.
(New Auditing) Com. – Vacancies having occured thro' resigna-
tions of Comrades Long & Rowley – R. F. Alexander
& J. C. Fitzgerald were appointed by the Capt. to
fill the unexpired terms of said Comrades
(4th July) It was decided to have a basket pic-nic on the
4th of July at West End Pavillion & the Dof C was
invited to join in same. Kroeger was appointed
Chairman & chose for his Assistants, Fanning, [fd]
horn & Barker.

Honorary Members – Mrs. J. W. Guinn & Prof. Wesley Peacock were
elected Honorary Members of the Camp.
There being no further business before the Camp
adjournment was made until 1st Sunday in July.
Geo. Jos. Peterson
   Adjt                          F. F. Collins  capt

Headquarters Albert Sidney Johnston Camp # 144 U.C.V.
            San Antonio, Tex.  July 5th 1908
Camp met in regular session at Kendels Hall. #[P]
F. F. Collins  Presiding.
Chaplain Long officiated as Chaplain, invoking the
blessing of the Deity on all Present & absent.
Communication from the family of the late General
Stephen D[ill] [Lee]                    read on minutes

The family of the late
General Stephen Dill Lee
desire to express their gratitude
for your kind sympathy
in their recent bereavement

communication from the Middle Tyler Camp __ __
busying the time in the __ __ __
__ of __ __ for expenses to Birmingham re-union
was read & order filed.

Communication from W. D. Shaw Adjt Genl & Chief of
Staff, notifying Camp of the State re-union, to be
held at Wells Point, Tx was received & ordered filed.
At this stage a thunder storm coming up, Capt.
Collins, vacated the chair to Lt Denny to hasten
home, stating his wife was very nervious whenever
a storm was brewing & if he could get to her side
to reassure he always did so.

__ of S. D. Camp was referred to Comrades Tim Smith,
Reynolds & Baker.

Wm. D. Travis was reported sick, having suffered
a paralytic stroke & Lt Denny was requested to
render such assistance as he deemed necessary.

__ N. M. Grisamore paid 500

Comrade Sloan moved that F. R. Collins resignation
as Captain of the Camp be laid over to next regular meeting
seconded & carried.

Communication from the Mayor of the City — Hon.
Bryan Callaghan — notifying Camp that he had
accepted two Fields from Lt Col Chas. N. Clark
U. S. A. which had been presented to the City of
San Antonio, Tx by the U. S. Congress, for the ben-
efit of the Confederate Camp of this City, was received
and __ that Lt Denny confer with His Honor
as to the __ __ __.

It was the concensus of the Camp that the ceremony
attending the acceptance & placing of same, one on
each side of the Confederate Veterans monument at
Travis Park be left to Mrs. J. D. Guinn Pres of W. of C
Denny was also appointed to make arrangements

Confederate-Monument-travis.JPG 800×533 pixels

9/29/17, 9:10 AM



Cg0vHhqUoAAnfSa.jpg 600×400 pixels                                      9/29/17, 9:11 AM





```
1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION

3    RICHARD BREWER, ET AL,                 :
     Plaintiffs,                            :
4                                           :
     vs.                                    : No. SA:17-CV-00837
5                                           : San Antonio, Texas
     RON NIRENBERG, ET AL,                  : August 31, 2017
6    Defendants.                            :
     * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
7

8                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE DAVID A. EZRA
9                SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11      Kirk D. Lyons, Esq.
        P.O. Box 1235
12      Black Mountain, NC   28711
        (828)712-2115
13      kdl@slrc-csa.org

14   FOR THE DEFENDANTS:
        Deborah Lynn Klein, Esq.
15      Office of City Attorney
        Frost Bank Tower
16      100 West Houston Street, 18th Floor
        San Antonio, Texas   78205
17      deborah.klein@sanantonio.gov

18   COURT REPORTER:

19   Angela M. Hailey, CSR, CRR, RPR
     Official Court Reporter, U.S.D.C.
20   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas   78206
21   Phone(210)244-5048
     angela_hailey@txwd.uscourts.gov

22

23

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1    (1:58 p.m.)

2              COURTROOM DEPUTY:   SA:17-CV-837, Richard Brewer

3    versus Ron Nirenberg, et al.

4              THE COURT:  All right, good afternoon.  Can I have

5    appearances please?

6         MR. CHAPMAN:  Good afternoon, Your Honor.  I'm

7    James Chapman appearing on behalf of Kirk Lyons who I

8    believe the court has permitted to also appear by

9    telephone.

10             THE COURT:  Yes.

11             MR. LYONS:  Mr. Lyons is present by telephone, if

12   y'all can hear me.

13             THE COURT:  We can hear you, Mr. Lyons.  Can you

14   hear me?

15             MR. LYONS:  Thank you.  Yes, sir.

16             MS. KLEIN:  Debbie Klein and Shawn Fitzpatrick.

17   Just for the record, we have not actually been served

18   at this point, but we did want to be heard on the

19   temporary restraining order.

20             THE COURT:  Okay.  All right, Mr. Lyons, are you

21   going to be making the argument?

22             MR. LYONS:  I can begin if I can be heard.  This

23   was filed, Your Honor, may it please this honorable

24   court, we filed this action just before the court

25   closed last night because we had information that the

12

3

1    City of San Antonio was going to vote and take down the

2    117-year-old confederate monument at Travis Park.  We

3    believe that we have met the elements for a temporary

4    restraining order.  I did enjoy reading the City's

5    brief response.  It's a great motion to dismiss motion,

6    it's a 12(b)6, but there wasn't very much temporary

7    restraining order there, save that likelihood of

8    success on the merits they put in doubt.  The case is

9    in Federal Court on a Federal question.  We are

10   obviously going to have to amend our complaint, we had

11   to do this very hurriedly and rushed and we have, you

12   know, we have time to do that since they have not

13   answered to properly amend it and clean it up, but

14   what's on issue here is the irreparable harm that will

15   be done if the City of San Antonio is allowed to take

16   down this 117-year-old monument probably tonight.

17   While we are trying to wrestle these issues in Federal

18   Court.  We have a case very similar to this in Austin

19   in the Western District of Texas, Austin Court, where

20   we have sued the University of Texas.  One of the

21   plaintiffs is the same in that case, Texas Division

22   Sons of Confederate Veterans.  The case was filed less

23   than a week -- a little over a week ago and just

24   yesterday we issued a joint advisory with the

25   University of Texas and the plaintiffs with the court

4

1          there in Austin which would allow essentially the

2          maintenance of a status quo while these issues --

3          especially if the 12(b)6 level are being pled and

4          argued.   That agreement was just signed yesterday and I

5          would be happy to make a copy of that available to the

6          court and opposing counsel, of course.

7                  THE COURT:  All right.  Just a minute,

8          Mr. Lyons --

9                  MR. LYONS:  We have a similar situation here in

10         that where we're facing irreparable injury, there's

11         always a possibility that the monument could be

12         damaged.  Once it's down makes it that much harder to

13         put back up and there's no -- we don't see that there

14         is a burden on the City whether they take it down

15         tonight or at the end of the 12(b)6 period if they

16         should prevail.  We certainly think it's in the public

17         interest.  Monuments are coming down all over the

18         nation.  We do have a Federal question, we think that

19         we can hold on to that Federal question that it's

20         appropriate, the First Amendment problems that we see

21         with the City of San Antonio mandating what this

22         statute stands for and why it should come down.  We

23         have cited the Barnes case of Supreme Court in Texas v.

24         Johnson regarding political speech of political bodies

25         in this context and we certainly think that we can

14

1   distinguish this case from the recent Walker versus

2   Texas SCV case.  Again that's more appropriate for the

3   12(b)6 level of this case and not the temporary

4   restraining order.

5          The likelihood of success on the merits, I

6   think that we have a fair shot at it, Your Honor.

7   There is of course the City has alleged a standing

8   problem which again is more proper to the 12(b)6 part

9   of this case.  The Supreme Court of Texas is probably

10  fixing to rule on that very issue within the next

11  couple of weeks on the standing issue, but we certainly

12  again we do need to beef up the standing that we have

13  alleged in the complaint and we have the right to do

14  that.  That analysis is not appropriate at the TRO

15  level and what we allege is irreparable injury if that

16  monument comes down tonight before we had a chance for

17  our arguments to be properly read and heard.  It's

18  certainly in the public interest.  We believe that

19  there is a likelihood that we can prevail on the merits

20  and certainly we do not think this puts an undue burden

21  on the City to wait until the judicial process can wind

22  its way.  It won't be that long.  If they're confident

23  that they can win at the 12(b)6 level and dismiss this

24  claim, you know, we're only going to be talking a

25  matter of weeks or just a couple of months before the

1    end of that process and so, Your Honor, we on behalf of

2    the plaintiffs and other similar situated, this

3    monument needs to stay here for the time being.

4         THE COURT:  All right.  Thank you very much,

5    Mr. Lyons.

6         MS. KLEIN:  May I respond, Your Honor?

7         THE COURT:  Yes.  That's why you're here.

8         MS. KLEIN:  First and foremost, Your Honor, we

9    would point out that while the plaintiffs have filed an

10   application for injunctive relief, they don't have any

11   request within their pleadings for final relief in this

12   case which in itself makes their entire suit infirm.

13   Beyond that, Mr. Lyons has indicated that our response

14   is more of a 12(b)6 motion, but in fact, as a basic

15   tenet of entering a temporary restraining order which

16   is an extraordinary relief, there are four elements

17   that it is plaintiff's burden of proof, it's not our

18   burden to disprove, although I think we've done that.

19   And the first of those is the likelihood of success on

20   the merits.  And if, in fact, what we've established is

21   a good 12(b)6 motion, that is establishing that there's

22   not a likelihood of success on the merits for the

23   plaintiff.  And I think it's important to note that as

24   those steps, those elements of a TRO are set fourth and

25   I'll refer the court specifically to Clark versus

16

1    Prichard out of the Fifth Circuit which is 812 F2d 991,

2    it's not just a likelihood, it's a substantial

3    likelihood of success on the merits.  And I would like

4    if it's okay with the court to go through some of the

5    elements that I've established through our response

6    already and may be a bit repetitive of what's been

7    filed, but I'd like to elaborate on some of them, if I

8    may.

9        THE COURT:  All right.

10       MS. KLEIN:  So first of all, there is a standing

11   question which Mr. Lyons has made light of in this

12   case.  However, standing is jurisdictional.  If they

13   don't have standing, the court doesn't have

14   jurisdiction over the case and we do not believe there

15   is standing in this case.  The plaintiffs have failed

16   to identify a single injury that is personal to them

17   which is an essential element of standing.  It's not

18   sufficient to just say I'm injured to the same extent

19   as the public at large.  They have to show a personal

20   injury to themselves.  Mr. Lyons indicated that he

21   expected some sort of ruling from the Supreme Court on

22   this issue in the future.  Well, the Texas Supreme

23   Court has spoken to this already.  And they've said

24   exactly that, that just merely being a taxpayer and

25   suffering the same supposed harm as the general public

8

```
 1     is not sufficient.

 2          THE COURT:  I'm aware of that.  The fact of the

 3     matter is that this court doesn't judge Federal

 4     constitutional claims predicated on the decisions of

 5     State Supreme Courts.  I look to Federal law, not State

 6     law.  State law may be instructive, but it is not

 7     controlling.

 8          MS. KLEIN:  I understand, Your Honor, and so I'd

 9     also reference the court to Flast versus Cohen, 392

10     U.S. 83, which is establishes that there is not a

11     qualification for taxpayer standing except in very

12     limited circumstances which relate to establishment

13     clause lawsuit which this is not.  The reason I cited

14     to the State law as well is because in the cases in the

15     Federal system that I was able to find this morning,

16     they all go to the expenditure of Federal funds and so

17     that's why just for the court's edification I also

18     wanted to reference the State law as well and what the

19     State's position has been on taxpayers.

20               We also have taken the position that the

21     parties that have been sued in this case are not the

22     proper parties to the suit.  The plaintiffs have filed

23     suit against each of the council members, not the City

24     of San Antonio.  The City Council is voting on the

25     agenda item today and once that item is passed, their
```

18

```
 1        roles and responsibilities with respect to it are

 2        essentially completed and it goes to the City to follow

 3        through on the actions that they have set forth.

 4              THE COURT:  Well, they sued the Mayor.

 5              MS. KLEIN:  They did sue the Mayor, Your Honor.

 6        But as a matter of record, we set forth that they did

 7        not file the suit against the proper parties.  More

 8        importantly, though, let's get to the actual causes of

 9        action which they pled which are three.  The first one

10        is this claim that the City doesn't actually own the

11        property at issue.  Their own pleadings dispel this

12        argument that they have made.  They concede in their

13        pleadings that in the 18 -- I believe it's the 1880s,

14        Mary Maverick, who was the owner of the property,

15        previously conveyed and recorded a conveyance of the

16        property to the City.  The City has held that property

17        uncontested except for one contest that we could find

18        since that time and that contest occurred in the 1950s

19        when the City was going to build an underground parking

20        garage in additional property that's next to the park.

21        And the court -- again it is in State Court, but the

22        court did judicially recognize the City's ownership of

23        that property.  And --

24              THE COURT:  Well, that, the court takes cognizance

25        of because that's a question of State law, who owns a
```

1    particular parcel of property or a building or a

2    monument would be determined generally, unless it's a

3    Federal parcel, by State law.  That's not what we're

4    talking about.  What I was talking about when I said we

5    don't judge Federal constitutional claims by rulings of

6    State Court on things like free speech and those --

7    because we have Federal law we look to.  In fact, the

8    Supreme Court of Texas, when judging a Federal

9    constitutional claim, is compelled to look to Federal

10   law as well.

11        MS. KLEIN:  And we believe the Federal law

12   supports our position in this case.  Going also along

13   the question of the ownership of the property, the

14   plaintiffs have not pled any allegation that they have

15   a property interest in that property.  They have no

16   standing to claim we don't own the property because

17   there's been no allegation that any plaintiff is

18   actually entitled to ownership of the property.  This

19   should have -- if it could be brought as a suit which

20   we don't believe it should, it's essentially a trespass

21   to try title suit and we believe that the allegations

22   as pled support the City owns the property.

23        They've also made an allegation of adverse

24   possession that -- and I may be getting their argument

25   wrong, but as I read their case, what they're

1    contending is that because the statue was placed on the

2    property in the 1890s and we did not record a deed

3    within 25 years, that that property has now become the

4    property of some other entity, not the plaintiffs,

5    through adverse possession.  And again I do rely on

6    State law for this proposition, but under the Texas

7    Civil Practice and Remedies Code, Section 16.061a,

8    Limitations do not apply against the interest of

9    government entity in the State of Texas.  So there is

10    no adverse possession that can be asserted against the

11    City of San Antonio.

12        Additionally under 16.030, it specifically

13    says that you cannot take adverse possession of

14    property -- a person may not -- of property that is

15    held for public use, such as a park.  So based on that,

16    their adverse possession arguments are without merit

17    and they are not likely to be successful on that.

18    They've also alleged this concept of estoppel -- I'm

19    going to butcher this, but I believe it's pronounced in

20    pais.  And the theory is that because the statue was

21    placed there and we haven't done anything about it,

22    that essentially it's an easement and we can't do

23    anything about it.  Again I rely on State law for this

24    concept of estoppel.  The states anyway have

25    established that there is no estoppel against a

21

12

1    government for enjoying its government functions and in

2    this particular case the operation of a park is deemed

3    to be a government function and we don't believe that

4    estoppel is appropriate. We don't believe there's been

5    facts alleged. And again this comes back to the

6    standing issue, I haven't seen any allegation that any

7    of the plaintiffs have a property interest in the

8    property that the statue is on and so based on that, we

9    don't believe they can be successful on that at the end

10   of the day.

11            The third claim is this claim that there is

12   an abridgment of their freedom of speech and of the due

13   process. On the freedom of speech, the U.S. Supreme

14   Court has clearly spoken through the decision of

15   Pleasant Grove, City of Pleasant Grove versus Summum,

16   not sure how to pronounce that. And in that, they

17   recognize the concept of government speech and

18   specifically discuss the fact that monuments and parks

19   are aspects of government speech. And so, therefore,

20   the scrutiny of a First Amendment claim is not truly

21   applicable to these challenges and that governments

22   control and have final authority over what speech is

23   displayed in their parks, assuming use of permanent

24   monuments. Whether those monuments are placed there by

25   the City or whether they give permission to someone

13

```
 1        else to place it, it turns into the government's speech
 2        because it is associated with the government's property
 3        which is the park.  The Supreme Court in that case
 4        clearly said that the government gets to make a
 5        decision what speech they choose to express.  And the
 6        mere fact that a hundred years or more ago the then
 7        reigning or the then installed Council -- poor choice
 8        of words, Your Honor -- the installed City Council at
 9        the time felt that was a government speech they were
10        comfortable with.  The current City Council, duly
11        elected by the public, does not agree with them.
12             THE COURT:  Have they actually voted yet?
13             MS. KLEIN:  The vote was going on this afternoon.
14        It passed.
15             THE COURT:  So there is an actual vote to remove
16        the statue.
17             MS. KLEIN:  There is an ordinance in place.
18             THE COURT:  So we do have a case or controversy
19        because if there had been no vote, if they hadn't
20        voted, if there hadn't been anything to challenge, we
21        wouldn't have a case or controversy and as you know in
22        Federal Court, the very first thing that I need to have
23        before I have jurisdiction, because this is a court of
24        limited jurisdiction, is a case or controversy, so now
25        we have a case or controversy.
```

23

14

```
 1              MS. KLEIN:  Thank you, Your Honor.  Plaintiffs
 2      have not alleged any specific free speech violation
 3      that would go to them as the plaintiffs.  I believe
 4      there's a pleading to the effect that the monument's
 5      free speech is being abridged, but the monument doesn't
 6      hold free speech.  To the extent that they're
 7      contending the monument was put up by the Daughters of
 8      Confederacy, they're not a party to this lawsuit.  The
 9      plaintiffs -- again it wouldn't matter anyway because
10      the monument at this point is considered to be
11      government free speech or should be considered to be
12      government free speech.  There is nothing that the
13      plaintiffs have alleged nor is there any evidence I
14      believe that they will be prohibited from exercising
15      their free speech rights as they're entitled to under
16      the law and in a public forum, but this particular
17      statue is not their expression of free speech, so
18      therefore, there's no likelihood they would succeed on
19      the merits of a free speech claim.
20              Their final claim is abridgment of a due
21      process.  Again the first question in looking at a due
22      process claim is what is the property or liberty
23      interest which they are claiming they've been deprived
24      of.  There's not one.  They have not established any
25      property interest in the monument itself or in the park
```

24

```
 1        property that they own as the plaintiffs.  They have

 2        tried to assert this freedom of speech, but as I've

 3        just addressed the court, that is not actually anything

 4        that's being abridged.  So based on that and based also

 5        on the fact that we have gone through the process,

 6        there has been an open meeting, there has been an

 7        opportunity for people to speak and the legislative

 8        body has taken the vote that it has, there has been

 9        appropriate due process for proceeding with the

10        decision to remove the statue as government speech.

11              The second element of a preliminary

12        injunction is the concept of irreparable harm and we do

13        not believe that there's been a sufficient pleading of

14        irreparable harm in this case.  The City represents

15        that the statue is not being destroyed.  It is being

16        removed, it will be stored.  If at the end of the day

17        the court should rule in favor of the plaintiffs on

18        this case, it can be replaced if the court so orders.

19        If there was damage to it, the City could be ordered to

20        repair any damage or to properly place an equal statue

21        back on the pedestal or back on the place where it's

22        currently located.  So we do not believe that there is

23        irreparable harm in this case to justify the issuance

24        of a temporary restraining order.

25              The third element is a question of where is
```

25

1    the greater injury in granting it or denying it.  We

2    don't believe the plaintiffs have established any

3    injury on their part as we said at the very beginning

4    because they failed to establish any sort of property

5    or liberty interest which is being violated.  We do

6    feel that if the TRO is granted, that there is a harm

7    to the City, it's to the City at large through both the

8    electoral process and the decisions made by the

9    community of the City of San Antonio to elect people to

10    the City Council to act on their behalf as well as to

11    the legislative process to make determinances to what's

12    in the best interest of the City.

13         And finally, the last one is whether or not

14    granting the TRO will disserve the public and the City

15    does feel strongly that granting this TRO will disserve

16    the public.  Mr. Lyons has stated as I think everyone

17    in this courtroom is well aware throughout the country

18    the issue of removal of these statues has been at the

19    forefront, it's all over the newspapers and we believe

20    that one day longer with the statue in place is one day

21    more of disservice to the public at large.  And so

22    based on that, we would ask that the court deny the

23    temporary restraining order.  We don't believe they've

24    met any of their burdens and in fact if we've been able

25    to establish that even one of their elements is not

```
 1      established, the TRO cannot go forward.  I also just
 2      for the record would like to reiterate as in our
 3      response, we've objected to the affidavit of Mr. Lyons.
 4      The only I guess evidence attached to his application
 5      is his own affidavit which states that he's read
 6      newspaper articles and talked to people.  He has no
 7      indication that any of the information contained within
 8      the petition is true and correct based on anyone's
 9      personal knowledge.  And so based on that, we don't
10      believe the temporary restraining order motion is
11      properly supported.  Does the court have any questions?
12           THE COURT:  I do not.
13           MS. KLEIN:  Thank you, Your Honor.
14           THE COURT:  Mr. Lyons, I'll give you a moment for
15      short rebuttal argument if you'd like.
16           MR. LYONS:  Yes, Your Honor, briefly.  One, as is
17      clear in our complaint, all of the defendants are
18      served in their official capacity which is essentially
19      makes it a suit against the City of San Antonio.  No
20      one is sued in their individual capacity.  I think that
21      was properly done.
22               Secondly, with all the monuments coming down
23      around the country, we have seen several instances
24      where government taking down monuments have botched it.
25      They have broken the monument, destroyed them and it's
```

27

```
 1    been badly done.  And any time that you take down a
 2    117-year-old monument, you're going to have problems if
 3    it's not done by experts.  The taxpayers of San Antonio
 4    are -- two of our plaintiffs are taxpayer citizens of
 5    San Antonio have an interest in their money not being
 6    wasted, that this not be done twice if we should
 7    prevail.  Our position is very reasonable, Judge, we're
 8    just asking for the status quo.  While we push this
 9    through the court, all of San Antonio's wonderful
10    12(b)6 arguments can then be properly pled and
11    researched and we can respond and we can take our time
12    and set up a preliminary injunction hearing where both
13    sides can more fully brief their positions, but the
14    12(b)6 standard does not apply here, Your Honor, and
15    anything that we have the right to fix anything that
16    San Antonio has very kindly pointed out for us if we
17    think it needs fixing, but right now we are facing
18    irreparable injury, it is in the public interest that
19    this monument be protected for now until these issues
20    are all brought out.  There is the pending jurisdiction
21    of the court to hear the State claims attached to the
22    Federal claims as long as they're related, so it's just
23    like what we did in Austin, Judge, give us the time to
24    pull the West Law out and get to work on this and
25    properly bring this through pleadings in the court
```

28

1    whether it be preliminary injunction hearing which we

2    can set at all parties' and the court's convenience or

3    a 12(b)6 motion which this is not the proper place to

4    argue, Your Honor.

5         THE COURT:  My understanding is at the University

6    of Texas a number of statues were, in fact, removed.

7         MR. LYONS:  Yes, Your Honor, that's true.  We did

8    not respond in time, but we -- our lawsuit was

9    regarding the pedestals or plinths that remained.

10        THE COURT:  The statues are gone.

11        MR. LYONS:  Statues are gone.  They're in storage

12    at the -- we didn't get there in time for that

13    because --

14        THE COURT:  I think what we need --

15        MR. LYONS:  The pedestals which they were going to

16    remove are being left by agreement.  That's what the

17    agreement covered is the plinths or pedestals that were

18    left that our information was were going to be removed.

19    That's what the status quo is, Your Honor.

20        THE COURT:  All right.  Okay.  I just want to make

21    it clear that there was no Federal judge in Austin that

22    issued a temporary restraining order or preliminary

23    injunction.  That didn't happen.

24        MR. LYONS:  No, that is correct, Your Honor.  No,

25    it was a joint advisory to the court by agreement.

1    THE COURT:  And it didn't actually have anything

2    to do with the statute themselves, it just had to do

3    with the bases of them.

4    MR. LYONS:  The pedestals, yes, Your Honor, that's

5    correct.

6    MR. CHAPMAN:  Your Honor, would the court allow me

7    to make --

8    THE COURT:  No, sir.  We have counsel here.  He's

9    already argued on behalf of the parties.  We can't --

10   this is not a tag team match here.

11   MR. CHAPMAN:  Thank you, Your Honor.

12   THE COURT:  So you have competent counsel.  I've

13   given him plenty of opportunity to argue.

14        First of all, I think the court needs to make

15   it very clear that my scope of consideration here has

16   to do with some very complicated issues of Federal law

17   having to do with constitution and having to do with

18   jurisdiction.  There is nothing in my charge here,

19   nothing, that gives me either the right or gives me the

20   authority to make an independent determination as to

21   whether or not it is a good thing or a bad thing to

22   have the statue of William Travis in the park.  That is

23   not my job, it is not my authority, I have no right to

24   do that and I have no intention of doing that.  That is

25   a function of a governmental body elected by the people

30

1    of the City of San Antonio, not a United States

2    District Judge appointed by President Reagan in 1988.

3    My job is to determine whether there is a free speech

4    violation here, whether the plaintiffs have standing to

5    assert their claim and that is it. So I want to make

6    it very clear here because unfortunately there is

7    always these misunderstandings. When Federal judges

8    who have limited jurisdiction make these decisions,

9    they're often misunderstood as being a decision on the

10    merits of a particular action taken by someone rather

11    than whether or not there is a Federal cause of action

12    that exists under the law and that is what my charge is

13    here. And I think that's very very important to

14    understand. Now, let me make it clear that I do not,

15    as I sit here today, I do not understand that it's the

16    City's present intention to destroy the statue. Am I

17    correct?

18         MS. KLEIN: That is correct, Your Honor, and we've

19    actually hired a company that's an expert in removal of

20    these sorts of statues.

21         THE COURT: So it's my understanding that what the

22    City intends to do is at some point remove the statue

23    and then -- intact, and then place it somewhere in

24    storage until the City finds another appropriate place

25    to house it. Am I correct?

Case 5:17-cv-00837-DAE   Document 13   Filed 09/19/17   Page 22 of 26
22

```
1        MS. KLEIN:  That is correct, Your Honor.

2        THE COURT:  Am I understanding that correctly?

3        MS. KLEIN:  That is correct, Your Honor.

4        THE COURT:  Now, of course, if the plaintiffs were

5   to prevail in their lawsuit, then the statue, if it was

6   removed, would have to be replaced.  So the point is

7   that the statue has to remain intact.

8        MS. KLEIN:  Yes, Your Honor.

9        THE COURT:  Right?

10        MS. KLEIN:  Yes.

11        THE COURT:  So we understand that.  And that isn't

12   always the case.  I mean I've seen other cases where

13   governmental bodies come in with a wrecking ball -- not

14   necessarily statue cases, but with historic properties

15   and so forth and the desire is to get rid of it and the

16   cheapest and easiest way to do that is to demolish it

17   and just have the remnants carted away and then someone

18   comes along and says, wait a minute, this is a historic

19   property, you can't do that, and then we have a Federal

20   lawsuit.

21        MS. KLEIN:  That's correct.  That is not the

22   intent here, Your Honor.  The intent is to remove it in

23   full -- I don't know what the proper term is, but

24   intact.

25        THE COURT:  Intact is the proper term.
```

32

1          MS. KLEIN:   Intact, keep it in storage.

2          THE COURT:   All right.   Well, the parties have

3     raised a number of issues here.   I'm not going to make

4     a ruling from the bench.   I think that's not

5     appropriate, but I do understand the importance of

6     getting a ruling out quickly.   It is my general

7     practice in a case such as this, and I've been doing

8     this for a long time, to issue a written ruling.   And I

9     do that for two reasons.   First of all, I do it so that

10    the parties have something in hand that explains

11    precisely what the court did and more importantly the

12    parties are entitled to know why I did it and the legal

13    basis for my ruling rather than the court just simply

14    saying I'm going to do this or that.   That's important.

15    Secondly, it also provides the parties a document by

16    which if they choose to do so, they can seek an

17    emergency appeal to the Fifth Circuit Court of Appeals

18    which is much more difficult to do if all you have is

19    an oral ruling, right?   And I believe in the appellate

20    process, I always have.   I'm not saying that people are

21    going to appeal what I do.   I do pretty good on appeal,

22    I understand, but the fact of the matter is I sit by

23    designation I have sat for over 27 years on the Ninth

24    Circuit Court of Appeals, I do it two or three times a

25    year, so I believe in the appellate process.   So if you

33

1          want to appeal what I do, I have every intent of

2          providing the parties with the document by which they

3          can do that, okay.  I will try to get an order out

4          by -- it's 2:30.  I will try to get an order out today

5          by 4:00.  My understanding is that nothing is going to

6          take place before 5:00, is that what we were told?

7                    MS. KLEIN:  That's correct, Your Honor.

8                    THE COURT:  All right.  Now, I would urge all

9          concerned to exercise a degree of contemplative

10         restraint regardless of what this court does, okay.

11         This is not the end of this case regardless of whether

12         I grant or deny the motion.  People have very strong

13         feelings about these issues and I understand and

14         appreciate that, I do.  But a resort to individual

15         action in a way that would cause disruption or worse is

16         not the right way to vindicate one's rights in a

17         situation like this.  It just isn't productive.  It

18         doesn't work, it backfires virtually every time it's

19         done and tends to validate the arguments made by the

20         opposing side, so I would certainly urge all to be

21         calm, let the process run its course.  Regardless of

22         what I do today, there will be a further motion in this

23         case down the road.  This is not a motion to dismiss

24         the case.  This is simply a motion to seek a

25         restraining order on the City's removal of the statue

34

25

```
 1        to another place where the statue would be preserved.

 2        It is not a request by the City to destroy the statue.

 3        That's important to understand.  So I will take the

 4        matter under advisement and as I said I'm going to try

 5        to get an order out in writing between four and 4:30

 6        this afternoon.  Okay.  Thank you very much for your

 7        arguments.  Thank you, Mr. Lyons.

 8             MR. LYONS:  Thank you, Your Honor.

 9             THE COURT:  Court stands in recess.

10             COURT SECURITY OFFICER:  All rise.

11   (2:34 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

35

```
 1                      *   *   *   *   *

 2   UNITED STATES DISTRICT COURT

 3   WESTERN DISTRICT OF TEXAS

 4

 5       I certify that the foregoing is a correct transcript

 6   from the record of proceedings in the above-entitled matter.

 7   I further certify that the transcript fees and format comply

 8   with those prescribed by the Court and the Judicial

 9   Conference of the United States.

10

11   Date signed:   September 13, 2017

12

13                              /s/ Angela M. Hailey
                                _____
14                              Angela M. Hailey, CSR, CRR, RPR
                                Official Court Reporter
15                              655 East Cesar E. Chavez Blvd.
                                Third Floor
16                              San Antonio, Texas   78206
                                (210)244-5048
17

18

19

20

21

22

23

24

25
```

36

AFFIDAVIT

My name is John McCammon; I am over the age of eighteen and am capable of providing this statement and affidavit.
I am providing this statement and affidavit of my own personal knowledge, freely and willingly, as part of a lawsuit filed by the Texas Division, Sons of Confederate Veterans.
I serve as Lieutenant Commander of the Texas Division of the Sons of Confederate Veterans. During my 15 years with the Sons of Confederate Veterans, it has been a privilege to honor the legacy of Confederate Veterans. We provide educational programs and awards to JROTC students.  We enhance civic functions throughout the United States through historical reenactments, participation in parades and festivals, maintain veteran's graves, and also by providing relief to those affected by natural disasters.

The SCV performs outreach to the community through programs about the Civil War to local schools and provide men and women dressed in period uniforms for various civic functions in San Antonio. I have been a member for 15 years. When not in the SCV, I am a retired account executive and live in Boerne, TX.

In addition, I am President of the Confederate Cemetery Association of San Antonio.  Our mission is to protect the graves of the Confederate Veterans and their families in our privately owned cemetery in San Antonio, TX.

I was disappointed to see the Confederate Monument in Travis Park come down and as I drove by Travis Park and saw where the City workers jack hammered the base of the monument and became alarmed. The base of the monument was designed and constructed of carved granite blocks. They were laid by the well-known sculpture, Frank Teich in 1899. Those granite blocks are valuable and cannot be replaced without being individually carved.

I was very concerned about the jack hammering. The base contained a time Capsule that contained the names of the ladies who raised the funds for the monument in the late 1890's. They held bake sales, quilting bees,

37

and teas to raise a few dollars at a time. By using those jack hammers, I fear they may have destroyed that time capsule as described in the newspaper and the roster of the members who raised those funds – along with the contents in that time capsule. The base of the monument was a critical part of the statue. I did not see the need to employ jack hammers. I was also surprised that the City of San Antonio started removing that monument without informing the Confederate Cemetery Association after saying in the paper that they would consider a panel to determine the disposition of the monument.  I attended the last public opportunity to speak about the preservation of the monument at city hall.  The mayor shook my hand and said that as a member of the SCV and President of the Confederate Cemetery Association that my input would be considered in the removal of the statue.  The Confederate Cemetery is available as I told the mayor that night.  I was never contacted again and the monument was taken down and covered with dirt and shrubs placed over where the statue stood.

I attended the hearing in the Federal Court where Senior Federal Judge, the honorable David Ezra, asked specifically of the city attorney if the statue was to be removed intact.  This was confirmed by the city attorney that the statue would be removed intact.

"I declare under penalty of perjury that the above statement is true and correct. I have been given an opportunity to review this statement and to make any necessary changes."

Signed on September 14, 2017.

John McCammon
Lt-Cdr, Texas Division
Sons of Confederate Veterans

State of _TEXAS_          County of _KENDALL_

Before me today personally appeared _JOHN FRANKLIN MCCAMMON JR_

On _15_ Day of _SEPT_ 2017 _____

MICHELLE M. HALL
Notary Public
State of Texas
ID # 13078937-9
My Comm. Expires 08-22-2020

michelle m Hall

38

Law Office of
**THOMAS J. CRANE**
110 Broadway, Ste 420
San Antonio, Texas 78205
210-736-1110
210-745-4258 (Fax)

27 September 2017

Deborah Lynne Klein
Office of the City Attorney
111 Soledad, 10th Floor
San Antonio, Texas 78205

    Re: *Brewer v. Nirenberg*/ Cause No. 17-CV-00837-DAE

Dear Ms. Klein,

I have left you telephone messages on Sept. 20 and 27. We also sent you letters dated Sept. 18 and 19. But, we have not heard back from your office. The Sons of Confederate Veterans would like to see the statue that was formerly in Travis Park and assess its condition. We would also like to know the status of the time capsule that was placed under the foundation in 1899.

Sincerely yours,

Thomas J. Crane

cc    John McCammon
      David Vandenberg

39