

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS,
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| Richard Brewer, | § | |
| And the Texas Division, | § | |
| Sons of Confederate Veterans, Inc., | § | |
| *Plaintiffs*, | § | |
| | § | |
| *v.* | § | |
| | § | |
| Ron Nirenberg, | § | |
| Mayor of the City of San Antonio, | § | |
| In His Individual Capacity, | § | |
| Roberto Trevino, William Shaw, | § Civil Action No. 5:17-cv-00837-DAE |
| Rebecca Viagran, Rey Saldana, | § | |
| Shirley Gonzales, Greg Brockhouse, | § | |
| Ana Sandoval, Manny Pelaez, and | § | |
| John Courage, San Antonio City | § | |
| Councilmen in Their Individual | § | |
| Capacities, Clayton Perry, | § | |
| San Antonio City Councilman | § | |
| In His Official Capacity, and | § | |
| The City of San Antonio, | § | |
| *Defendants.* | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

### A. PARTIES

1.    Plaintiff, Richard Brewer, is an individual, a citizen of the State

of Texas, a resident taxpayer of the City of San Antonio, and a descendant of

Confederate veterans.

2.      Plaintiff, Texas Division, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

3.      Defendant, Ron Nirenberg, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

4.      Defendant, Roberto Trevino, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

5.      Defendant, William Shaw, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

6.      Defendant, Rebecca Viagran, is an officer of the City of San Antonio and is being sued in her individual capacity.  She may be personally served with process at her place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

7.      Defendant, <u>Rey Saldana</u>, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

8.      Defendant, <u>Shirley Gonzales</u>, is an officer of the City of San Antonio and is being sued in her individual capacity.  She may be personally served with process at her place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

9.      Defendant, <u>Greg Brockhouse</u>, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

10.     Defendant, <u>Ana Sandoval</u>, is an officer of the City of San Antonio and is being sued in her individual capacity.  She may be personally served with process at her place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250.  *See* Fed. R. Civ. P. 4(e)(2)(A).

11.     Defendant, <u>Manny Pelaez</u>, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City

Hall, 100 Military Plaza, San Antonio, Texas 78250. *See* Fed. R. Civ. P. 4(e)(2)(A).

12.     Defendant, <u>John Courage</u>, is an officer of the City of San Antonio and is being sued in his individual capacity.  He may be personally served with process at his place of business, Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250. *See* Fed. R. Civ. P. 4(e)(2)(A).

13.     Defendant, <u>Clayton Perry</u>, is an officer of the City of San Antonio and is being sued in his official capacity.  He may be served by serving the Office of the City Council, City Hall, 100 Military Plaza, San Antonio, Texas 78250. *See* Fed. R. Civ. P. 4(i)(2).

14.     Defendant, <u>the City of San Antonio</u>, a municipal corporation, may be served by delivering a copy of the summons and complaint to its chief executive officer, Mayor Ron Nirenberg. *See* Fed. R. Civ. P. 4(j)(2)(A).

## B.  JURISDICTION

15.     The Court has jurisdiction over the lawsuit, because the suit arises under Amendment I of the U.S. Constitution.  "Congress shall make no law . . . abridging the freedom of speech.". . . 28 U.S.C. § 1331. *Gunn v. Minton*, 133 S.Ct. 1059, 1064 (2013); *Exxon Mobil Corp. v. Allapattah Servs.*, 545 U.S. 546, 552 (2005).

16.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over plaintiffs' claims to title to the two cannon, formerly beside the Travis Park Monument, the memorial artifacts in the time capsule, as well as to

defendants' conversion of the cannon and artifacts, because plaintiffs' claims are so related to their free-speech claim within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.  Further jurisdiction is had over plaintiffs' Texas-Antiquities-Code claim that defendants violated certain subsections of the code by removing and damaging the subject matter of suit.  TEX. NAT. RES. CODE ANN. § 191.173(a).   Since the state claims and the federal claim arise from the same nucleus of facts, the removal of the Monument, the removal of the cannon, and the removal of the memorial time capsule, supplemental jurisdiction over the state claims are proper.  *Exxon Mobil*, 545 U.S. at 558; *see City of Chicago v. International Coll. of Surgeons*, 522 U.S. 156, 167 (1997).

17.   This action is brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which provides redress to persons who have been deprived of their civil rights under color of state law, and under 28 U.S.C. § 1331 and § 1343(a)(3)(4).  These provisions confer jurisdiction on this Court to adjudicate violations of federal civil-rights acts and applicable provisions of the U.S. Constitution.

18.   The Court has authority to grant declaratory relief, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  Remedies are available under 42 U.S.C. § 1983.

## C. VENUE

19.     Venue is proper in this district under 28 U.S.C. § 1391(B)(2), because all of the events or omissions giving rise to these claims occurred in this district and because all of the property at issue is situated in this district.    The Confederate Monument in Travis Park, the cannon, and the memorial artifacts are located in this district, and defendants' actions occurred in this district.  Venue also lies under 28 U.S.C. § 1400(a), because defendants reside or may be found in this district.  Venue in this Court is further established under the Texas Antiquities Code for the reasons stated above in this section.  TEX. NAT. RES. CODE ANN. § 191.173(b).

## D. FACTS

20.     Plaintiff Richard Brewer is a citizen of the State of Texas, a resident taxpayer of the City of San Antonio, and a descendant of Confederate veterans.

21.     Plaintiff Texas Divison, Sons of Confederate Veterans, Inc., is a non-profit corporation that is organized under the laws of the State of Texas.

22.     On March 27, 1899, the San Antonio City Council gave the Confederate Daughters[1] "permission and [] a perpetual place in Travis Park to erect the Confederate Monument."  History of Confederate Monument in Travis Park.  (ECF No. 14-1 at 3).

23.     On June 4, 1899, the *San Antonio Sunday Light* reported that

---

[1] The "Daughters of the Confederacy" refers to the United Daughters of the Confederacy.

the foundation stone to the Travis Park Confederate Monument had been laid. *Memorial Shaft*, San Antonio Sunday Light, June 4, 1899, at 1. A capsule was laid within the stone that included "the Roster of the Barnard E. Bee lodge, several Confederate bills and coins, a Confederate flag bearing the name of Jeff Davis with a wreath of violets, pressed flowers from Winnie Davis' coffin, the daily newspapers and an old testament given by J.E. Thomas, who was a prisoner in Alton, Ill., for 32 months." *Id.* The newspaper reports further that "The stone was declared well and truly laid and memorial articles were placed therein: amid patriotic airs." *Id.*

24.     On July 5, 1908, the Albert Sidney Johnston Camp, No. 144, of the United Confederate Veterans[2] recorded that the Mayor of San Antonio, the Hon. Bryan Callaghan,

> accepted two field [cannon] from Lt. Col. Chas. N. Clark.
> U.S.A.[,] which had been presented to the City of San Antonio,
> Tex.[,] by the U.S. Congress, for the benefit of the Confederate
> Camp of this City, was received and ordered that Lt. Denny
> confer with His Honor as to the disposition of same. It was the
> consensus of the Camp[] that the ceremony attending the
> acceptance & placing of same, one on each side of the
> Confederate Veterans monument at Travis Park be left to Mrs.
> J.D. Guinn of D. of C.

Copies of Minutes of Albert Sidney Johnston Camp 144. (ECF No. 14-1 at 8-9.)

25.     On Monday, July 31, 2017, City Councilmen Roberto Trevino and William Shaw filed a memo with the council's Governance Committee to request a full council vote to remove the Travis Park Confederate Monument.

---

[2] The Sons of Confederate Veterans is the successor association to the United Confederate Veterans. Appendix .

Scott Huddleston, *New Home May Be Sought for Confederate Statue*, San Antonio Express-News (July 31, 2017, 5:17 p.m.), http://www.mysanantonio.com/news/local/article/New-home-may-be-sought-for-Confederate-statue-11721508.php. Subsequently, the City Council voted to remove the Travis Park Confederate Monument. Kelsey Bradshaw, *San Antonio Removes Confederate Statue in Travis Park*, San Antonio Express (September 1, 2017, 11:04 a.m.), http://www.mysanantonio.com/news/local/article/San-Antonio-removing-Confederate-statue-in-Travis-12165970.php.

26.     On Monday and Tuesday, September 1 and 2, 2017, defendants had the Travis Park Confederate Monument removed. Alex Zielinksi, *Travis Park's Confederate Monument Has Been Removed*, San Antonio Current (September 1, 2017, 10:28 a.m.), https://www.sacurrent.com/the-daily/archives/2017/09/01/travis-parks-confederate-monument-has-been-removed.

27.     Judge Ezra was explicit in his instructions to defendants that they could remove the Monument, but only if they maintained the Monument intact and without damage. Transcript; (ECF No. 13 at 21-23 and ECF No. 14-1 at 32-34).

28.     Mr. John McCammon, the President of the Confederate Cemetery Association of San Antonio and Lt. Commander of the Texas Division, Sons of Confederate Veterans, witnessed the removal of the Travis

Park Monument.   Affidavit; (ECF No. 14-1 at 38-39).   Mr. McCammon reported that he had serious concerns about the integrity of the Monument, because the workers used jackhammers to remove the Monument's base and likely damaged the artfully carved stones of the oldest work of public art in Texas.   *Id.*   Further, the base contained a time capsule that included Confederate currency, a historic Bible, a Confederate flag, and other items of value. *Id.; Sunday Light.*

29.   Plaintiffs discovered that defendants had seriously damaged the Travis Park Monument, contrary to the Court's admonitions to defendants to remove the Monument "intact" and defendant's five-fold promise to remove the Monument "intact." (ECF No. 13 at 21-23). "THE COURT:  Intact is the proper term.  MS. KLEIN:  Intact, keep it in storage." (ECF No. 13 at 22-23). Intact means "(1) untouched, especially by anything that harms or diminishes, (2) having no relevant component removed or destroyed, *as of a living body or its parts.*" *Merriam-Webster Online.*   Defendants broke the rifle held by the Private Snuffy figure at the top of the Monument in half; defendants split a granite foundation stone in two; defendants have sheared off an entire corner of an engraved stone; and defendants have lost the time capsule. (ECF No. 40-1 at 1-4, 6, 9, 11, 15-18, and 23).

30.   Plaintiffs sent copies of the photographic evidence of damage to Steve Tatti, principal and chief conservator of Tatti Art Conservation in New York, New York.  Mr. Tatti has conserved the Statue of Liberty in New York

Harbor and other works of public art of international significance.  Mr. Tatti
will complete a Condition Report of the Monument to determine the extent of
damage and the means necessary to repair it.  (ECF No. 40-2).

31.     Defendants deny having damaged the Monument, contrary to
the photographic evidence and independent review of their own photographs.
(ECF No. 36 at 3).

### E.  PLAINTIFFS' CLAIMS

32.     Plaintiffs hereby incorporate their First Amended Complaint by
reference.

### I.  INDIVIDUAL PLAINTIFF HAS TAXPAYER STANDING.

33.     The U.S. Supreme Court has ruled that resident taxpayers of a
municipality have standing in federal court to challenge the municipality's
illegal expenditure of funds.  "Resident taxpayers may sue to enjoin an illegal
use of the moneys of a municipal corporation."  *Commonwealth of
Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923) (citing *Roberts v.
Bradfield*, 12 App. D.C. 453, 459-60).  "The interest of a taxpayer of a
municipality in the application of its moneys is direct and immediate and the
remedy by injunction to prevent their misuse is not inappropriate.  It is
upheld by a large number of state cases and is the rule of this court."  *Mellon*,
262 U.S. at 486 (citing *Crampton v. Zabriskie*, 101 U.S. 601, 609 (1879)); *see
also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006).[3]

---

[3]  The provision of an equitable remedy to a single resident taxpayer against a municipal
corporation is similar to the relation between a stockholder and a private corporation.

34.   Richard Brewer is a resident taxpayer of the City of San Antonio. His address is 3302 Blackstone Run, San Antonio, Texas 78259.  Mr. Brewer has been a resident taxpayer at this address since 2002.  Mr. Brewer is a resident taxpayer in the City of San Antonio, he has contested that the removal of the Travis Park Monument is unconstitutional, *Ehm v. San Antonio*, 269 Fed.App'x 375, 377 (5th Cir. 2008), and defendants have expended taxpayer funds in the illegal removal; therefore, Mr. Brewer has taxpayer standing in this matter.  *DaimlerChrysler*, 547 U.S. at 349; *Mellon*, 262 U.S. at 486; *Crampton*, 101 U.S. at 609.

## II.   DEFENDANTS HAVE ABRIDGED PLAINTIFFS' RIGHT TO FREE SPEECH BY REMOVING THE TRAVIS PARK MONUMENT AND THE CANNON.

35.    A bedrock principle of the First Amendment is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); U.S. CONST. AMEND. I.; *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 577 (1991) ("Where the government prohibits conduct *precisely because of its communicative attributes*, we hold the regulation unconstitutional.") (Scalia J., concurring).

36.    A significant exception to the right to free speech is found in the government-speech doctrine.  *Pleasant Grove City, Utah, v. Summum*, 555 U.S. 460, 460 (2009).  Here, the court held that a government actor "is

---

*Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923).  The relations of a resident taxpayer to the federal government or a state government, however, are very different and do not admit standing.  *Id.*

entitled to say what it wishes and to select the views that it wants to express." *Id.* "The placement of a permanent monument in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause." *Id.* The government-speech doctrine is an absolute defense to First Amendment challenges, and an unwise one at that. *Johanns v. Livestock Marketing Assn.*, 544 U.S. 550, 571 (2005) (Souter, J., dissenting). Unchecked expansion of the government-speech doctrine threatens to erode constitutional protections by allowing viewpoint discrimination in an increasingly wide range. *Developments in the Law— State Action and the Public/Private Distinction*, 123 HARV. L. REV. 1248, 1293 (2010).

37.   One significant area of exemption from the government-speech doctrine is where government funds speech through subsidies in order to promote diversity.[4] The U.S. Supreme Court in its first government-speech case took pains to acknowledge that the government may not discriminate against government-subsidized activities solely on the basis of viewpoint. *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

38.   In like manner, the government cannot make viewpoint restrictions of speech, even in unprotected forms of speech, such as libel. *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 383-84 (1992).

---

[4]  Another exemption, the Establishment Clause, is discussed in some detail in *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 460 (2009); *see* Scalia concurrence. *See also R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, FN 4 (1992).  This exemption is not in controversy in this matter.

[T]hese areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution, so that they may be made the vehicles for content discrimination unrelated to their distinctively proscribable content. Thus, the government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.

*R.A.V.*, 505 U.S. at 383-84.

That would mean that a city council could enact an ordinance prohibiting only those legally obscene works that contain criticism of the city government or, indeed, that do not include endorsement of the city government. Such a simplistic, all-or-nothing approach to First Amendment protection is at odds with common sense and with our jurisprudence as well.

*R.A.V.*, 505 U.S. at 384.[5]

39.     The prohibition against viewpoint discrimination holds true for government speech in a limited public forum. *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 833 (1995). "[W]hen the State is the speaker, it may make content-based choices. . . . We recognized that[,] when the government appropriates public funds to promote a particular policy of its own[,] it is entitled to say what it wishes." *Id.* "It does not follow, however, and we did not suggest in *Widmar*, that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

---

[5]   Justice White asserts that the prohibition against government burdening of speech content critical of government is not a First Amendment consequence, but rather a consequence of the Equal Protection Clause. *R.A.V.*, 505 U.S. at n. 4.

> [W]e reaffirmed the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that "[t]he case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to "aim at the suppression of dangerous ideas." (citations omitted).

*Rosenberger*, 515 U.S. at 834.

In other words, when the government provides subsidies to support diversity of viewpoint, the government must maintain viewpoint neutrality in the provision of such subsidies, even in speech the government adopts as its own, and the government may not suppress ideas it deems offensive.

40.     This prohibition on viewpoint discrimination serves to bar the government from skewing public debate. *Id.* at 894. (Souter, J., dissenting). "It is precisely this element of taking sides in a public debate that identifies viewpoint discrimination and makes it the most pernicious of all distinctions based on content." *Id.* at 895.

41.     The *Rosenberger* court concerns itself with the prohibition of viewpoint discrimination in government speech in a limited public forum. *Id.* at 819. *National Endowment of Arts v. Finley* inquires into the prohibition of viewpoint discrimination in government speech in a government forum. 524 U.S. 569 (1998).[6]

42.     A government actor in a government forum, such as the National Endowment for the Arts (NEA), may not leverage its power to award subsidies by subjective criteria to penalize disfavored viewpoints. *Id.*

---

[6] *Summum* does not inquire into subsidies in relation to government speech, nor into the requirement that the government may not provide subsidies to promote diversity of viewpoint in any forum and exercise viewpoint discrimination.

at 587-88.   Indeed, works of art are unquestionably shielded by First Amendment protection.  *Id.* at 602.  (Souter, J., dissenting).

> The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions, though they may indeed comment on the political, but simply on their expressive character, which falls within a spectrum of protected speech extending outward from the core of overtly political declarations.  Put differently, art is entitled to full protections because our "cultural life," just like our native politics, "rest upon [the] ideal" of governmental viewpoint neutrality.

*National Endowment for the Arts*, 524 U.S. at 602-03.

43.   Government may not discriminate against viewpoint, when government expends funds to encourage diversity of viewpoint from private speakers.  *Id.* at 613  (quoting *Rosenberger*, 515 U.S. at 834).  "When the government acts as patron, subsidizing expression of others, it may not prefer one lawfully stated view over another."  *Id.*

> So long as Congress chooses to subsidize expressive endeavors at large, it has no business requiring the NEA to turn down funding applications of artists and exhibitors who devote their "freedom of thought, imagination, and inquiry" to defying our tastes, our beliefs, or our values.  It may not use the NEA's purse to "suppress dangerous ideas."

*National Endowment for the Arts*, 524 U.S. at 613-14 (quoting *Regan v. Taxation with Representation for Wash.*, 461 U.S. 540, 548 (1983)).

44.   The right of free speech under the First Amendment from government control was affirmed in *Masterpiece Cakes, Ltd. v. Colorado Civil Rights Comm'n*, 584 U.S. ____ (2018).   Although the court primarily addressed the Free Exercise Clause, a second and equally important issue

was rights under the Free Speech Clause, which concerns us in the instant matter. *Id.* (slip op., at 1-2). The free speech aspect of the case involved the symbolic message conveyed by a wedding cake and whether a government actor may limit speech it deems offensive to a protected class, even speech that is communicated as a sincerely held religious belief. *Id.* (slip op., at 1-2, 9). Appellant Phillips argued that the government could not compel his speech inconsistent with his religious beliefs and when communicated through artistic expression. *Id.* (slip op., at 10-11). The court ruled that:

> A principled rationale for the difference in treatment of these two instances cannot be based on the government's own assessment of offensiveness. Just as "no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943), it is not, as the Court has repeatedly held, the role of the State or its officials to prescribe what shall be offensive. See *Matal v. Tam*, 582 U.S. ___, ___ (2017) (opinion of ALITO, J.) (slip op., at 22-23).

*Masterpiece Cakes*, 584 U.S. at ___. (slip op., at 16).

45. Justice Thomas wrote in his partial concurrence and concurrence in the judgment that attempts by government actors to penalize expressive conduct, such as the production of an artistic wedding cake, must be able to withstand strict scrutiny. *Id.* (slip op., at 45). States cannot punish protected speech, including expressive or political speech, because someone finds it "offensive, hurtful, stigmatic, unreasonable, or undignified." *Id* (slip op., at 56).

> "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an

idea simply because society finds the idea itself offensive or disagreeable." *[Texas v.] Johnson*, [491 U.S. 397, 414 (1989)]. A contrary rule would allow the government to stamp out virtually any speech at will. See *Morse v. Frederick*, 551 U.S. 393, 409 (2007) ("After all, much political and religious speech might be perceived as offensive to some"). As the Court reiterates today, "it is not the role of the State or its officials to prescribe what shall be offensive." *Ante*, at 16. "'Indeed, if it is the speaker's opinion that give offense, that consequence is a reason for according it constitutional protection.'" *Hustler Magazine, Inc., v. Falwell*, 485 U.S. 46, 55 (1988); accord, *Johnson, supra*, at 408-409. If the only reason a public-accomodations law regulates speech is "to produce a society free of . . . bias" against the protected groups, that purpose is "decidedly fatal" to the law's constitutionality, "for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression." *Hurley [v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 578-579 (1995)]; see also *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000) ("Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails"). "[A] speech burden based on audience reactions is simply government hostility . . . in a different guise." *Matal v. Tam*, 582 U.S. ___, ___ (2017) (KENNEDY, J., concurring in part and concurring in judgment) (slip op., at 4).

*Masterpiece Cakes*, 584 U.S. at ___. (Thomas, J., concurring) (slip op., at 56).

46.     The City of San Antonio's Public Art Program, Public Art San

Antonio (PASA), has published its Policy and Guidelines for Public Art.

GETCREATIVESANANTONIO.COM,

http://www.getcreativesanantonio.com/Public-Art/Policy-Guidelines       (last

visited June 4, 2018). PASA specifically seeks through its ten-part guidelines

"to select experienced artists who represent the diverse cultural landscape of

San Antonio and to encourage the design enhancements that are accessible to

the public and respects the historical resources and mobility of the citizenry."

*Id.*

47.     PASA has published its four values in its master plan.  Public

Art   San   Antonio,   GETCREATIVESANANTONIO.COM   at   8-12,

http://www.getcreativesanantonio.com/Portals/3/Files/DCCD-

PASA/PASA%20MASTER%20PLAN%202008-06-10%20for%20web-small.pdf

(last visited June 4, 2018).   PASA's first value is to "Share Stories."  *Id.*

> All [stories] contribute to San Antonio's unique identity.  By
> drawing on these unique stories through public art, the city can
> reveal what is hidden and recall what is forgotten.   This is
> important because, as writer John Philip Santos says, "At the
> founding of many American cities lurk unsavory tales of
> invasion   and   mayhem,   usually   whitewashed   or   forgotten.
> Whether it's the hoary presence of old buildings or a nebula of
> run-down shacks and other ruins, the evidence of the past – raw,
> weathered, and scarred – raises accusatory questions.  How did
> this all come about?   What price was paid, by whom, and for
> whose sake?   Who was here before the whole story began?
> Troubled by the wraiths of American history, our cities have
> been bled by the suburbs and washed in the waters of urban
> renewal.". . .

Public Art San Antonio Master Plan at 9.

The City expressly embraces diversity of thought and experience, and in

particular "unsavory" history in its master plan for public art.  PASA has

defined "Diversity in culture and art" as a significant and important

characteristic of its planning process.  *Id.* at 20.

48.     The City subsidizes existing and planned public art through an

extensive master plan that uses diversity as a core value for public art.  *Id.* at

25-39.

49.    Mayor Nirenberg has publicly stated that Confederate memorials glorify slavery and a war against the United States to preserve slavery.  Joey Palacios, *Should the Travis Park Confederate Monument Be Relocated?*, TEXASSTANDARD.ORG,     (July     24,     2017,     10:59     a.m.), https://www.texasstandard.org/stories/categories/texas-public-radio/should-the-travis-park-confederate-monument-be-relocated/.     City     Councilmen Roberto Trevino and Cruz Shaw stated "Our public spaces should not be dedicated to symbols of power that honor an ideology which regarded black Americans   as   property."    *Councilman   Roberto   Trevino   Reflects   on Community     Conversation     Surrounding     Confederate     Monument*, SANANTONIO.GOV      (July      6,      2017), https://www.sanantonio.gov/Commpa/News/ArtMID/1970/ArticleID/10901/Councilman-Roberto-Trevi241o-reflects-on-community-conversation-surrounding-Confederate-monument.   Defendants removed the Travis Park Monument solely because they disfavored plaintiffs' political speech and imputed repugnant speech to the Monument.  Defendants' public comments about the Monument's political speech were exemplars of defendants' open hostility to plaintiffs' political viewpoint.

50.    The First Amendment protects discrimination against freedom of speech by the government.  *Masterpiece Cakes*, 584 U.S. at ____ (slip op., 56); *National Endowment*, 524 U.S. at 616, *Simon & Schuster, Inc. v. Members of the New York State Crime Bd.*, 502 U.S. 105, 116 (1991).

Defendants are constitutionally enjoined from disfavoring or favoring political viewpoints they have subsidized and called forth through their master plan for diversity in public art, *Id.* at 613-14; *see also Regan,* 461 U.S. at 548, because they opened the door to diversity of political viewpoint in public art and cannot thereafter favor or disfavor one political viewpoint over another because a viewpoint is offensive. Indeed, defendants must affirmatively protect offensive viewpoints in public art. *Masterpiece Cakes,* 584 U.S. at ____ (slip op., 56) (citing Matal, 582 U.S. at ____ (slip op., 22-23)); *National Endowment,* 524 U.S. at 602-03. This protection is heightened, because defendants are subsidizing public art to promote diversity of artistic speech. In particular. defendants romoted the production of historic speech that portrays "unsavory tales of invasion and mayhem, usually whitewashed or forgotten." Public Art San Antonio Master Plan at 9. Defendants may not then whitewash and attempt to forget the self same historic speech defendants requested merely because it is the offensive speech they requested.

51. The opinion in *Masterpiece Cakes* prevents government compulsion of speech contrary to sincerely held religious beliefs. This protection should, if it does not now, extend to the protection of political viewpoint in speech in government forums where the government has expressly sought and subsidized diversity of political or artistic viewpoint. The government cannot restrict artistic or political speech, merely because

the government, a third person, or a group finds the speech offensive. *Masterpiece Cakes*, 584 U.S. at ___. (slip op., at 56). Indeed, defendants' burdening plaintiffs' speech, based on public reactions, is simply a form of government hostility in another guise. *Id.* (quoting *Matal*, 582 U.S. at ___. (slip op., at 4)). When plaintiffs' speech expressed through the Monument gave offense, that offense was the reason for constitutional protection. *Id.* (citing *Hustler Magazine*, 485 U.S. at 55; accord, *Johnson, supra*, at 408-409). The Court should hold that defendants unconstitutionally burdened and terminated plaintiffs' continuing right to free speech, expressed through the Monument and cannon in Travis Park and removed by defendants. Defendants agreed to display the memorial objects and express plaintiffs' political viewpoint in perpetuity, and defendants cannot burden plaintiffs' political speech merely because defendants now find plaintiffs' viewpoint offensive. Indeed, when defendants found the agreed political viewpoint offensive was the moment that defendants were required to protect plaintiffs' speech, not terminate it.

### III. DEFENDANTS VIOLATED THE TEXAS ANTIQUITIES CODE BY REMOVING THE TRAVIS PARK MONUMENT AND MUST RETURN THE MONUMENT.

52.     The Texas Antiquities Code protects and preserves historic and educational sites on public and private land in the State of Texas.

> It is the public policy and in the public interest of the State of Texas to locate, protect, and preserve all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical,

> archeological, educational, or scientific interest . . . in, on, or under any of the lands in the State of Texas. . . .

TEX. NAT. RES. CODE ANN. § 191.002; Op. Att'y Gen. H-250 at 2 (1974).

53.     Sites of historic interest are the sole property of the State of Texas and may not be destroyed, nor removed without a permit from the Texas Historical Commission.

> Sites, objects, buildings, artifacts, implements, and locations of historical, archeological, scientific, or educational interest . . . that are located in, on, or under the surface of any lands belonging to the State of Texas or by any county, city, or political subdivision of the state are hereby declared to be state archeological landmarks. . . .

TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974).

> Landmarks under Section 191.091 or 191.092 of this code are the sole property of the State of Texas and may not be removed, altered, damaged, destroyed, salvaged, or excavated without a contract with or permit from the [Texas Historical Commission].

TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974).

> In our opinion, then, [§§ 191.092(a) and 191.093] of the Antiquities Code requires that the permission of the Antiquities Committee be obtained in the form of a permit before any site of historical or archeological interest located on public lands can be altered, damaged, destroyed, etc.

Op. Att'y Gen. H-250 at 2 (1974).

53.     Designated sites of historic interest are landmarks under the Texas Antiquities Code and entitled to protection.

> In our view, the term "historic interest" under the Antiquities Code is a site which has been designated with a Texas Historical Marker, certified as worthy of preservation under section 15 of article 6145, or which is listed on the National Register pursuant to 16 U.S.C. 470a.

Op. Att'y Gen. H-620 at 5 (1974).

The Texas Administrative Code affirmed that "all landmarks are afforded some level of consideration prior to being affected by a proposed project." Sec. 26.2(2).

> Section 191.0525 of the Texas Natural Resources Code requires that notice be provided to the commission before breaking ground at a project location on state or local public land. This step ensures that project effects on landmarks, <u>whether or not they have currently been identified</u>, are appropriately considered. (emphasis added).

TEX. ADMIN. CODE § 26.2(3).

54.    The Texas Antiquities Code provides for criminal penalties for violations of provisions of the chapter.

> (a) A person violating any of the provisions of this chapter is guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than $50 and not more than $1,000, by confinement in jail for not more than 30 days, or by both.
> (b) Each day of continued violation of any provision of this chapter constitutes a separate offense for which the offender may be punished.

TEX. NAT. RES. CODE ANN. § 191.171; Op. Att'y Gen. H-250 at 3 (1974).

> [W]e believe the Legislature intended to guard and protect archeological landmarks found on publicly owned property with the same vigor as those found on private land and that it intended to forbid <u>unpermitted</u> destruction or alteration of such landmarks by government employees or officers, as well as by private persons.

Op. Att'y Gen. H-250 at 4 (1974).

54.    Travis Park, its Monument, the cannon, and the time capsule are protected under the Texas Antiquities Code.  The Monument and cannon

are objects and were a location of historical and educational interest on land belonging to a political subdivision of the State of Texas and is, therefore, a state archeological landmark.  TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974).

55.    A state archeological landmark, as defined under sections 191.091 and 191.092 of the Texas Antiquities Code, is the sole property of the State of Texas and may not be removed altered, damaged, destroyed, salvaged, or excavated without a contract with or permit from the Texas Historical Commission.  TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974); http://www.thc.texas.gov/preserve/projects-and-programs/state-antiquities-landmarks/antiquities-permits.  The Travis Park Monument is a state archaeological landmark, as defined under section 191.092, and defendants had no authority to move, nor to damage the Monument without a prior permit or contract with the Texas Historical Commission.  Plaintiffs have found no record, nor any application for this mandatory permit.

56.    The Texas Antiquities Code provides for a second layer of protection for sites of historic interest, which are places designated with a Texas Historical Marker or listed on the National Register of Historic Places.  Op. Att'y Gen. H-620 at 5 (1974).  This second layer covers the Travis Park Monument, because defendants expressly sought this protection for the entire

downtown and Riverwalk historic district that includes Travis Park and the Monument.

(see:https://atlas.thc.state.tx.us/NR/pdfs/100002128/100002128.pdf

Details for San Antonio Downtown and River Walk Historic District (Atlas Number 2100002128) National Register Listing — Atlas Number 2100002128). Defendants cannot ignore the historic and protected status of the Travis Park Monument, when it was they themselves who sought federal protection for the Monument and its encompassing district.

57.    Defendants criminally violated Section 191.093 of the Texas Antiquities Code. The Travis Park Monument is a state archeological landmark, because it is a site of historic interest and defendants sought national-register listing prior to its removal. TEX. NAT. RES. CODE ANN. § 191.092(a); Op. Att'y Gen. H-250 at 2 (1974). The Monument is a site of historical interest, because defendants requested inclusion of the Monument on the National Register and received it. . Since the Monument is a historic site and a state archeological landmark, defendants were required to request and receive a permit of the Texas Historic Commission prior to removal of the Monument. TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974). Defendants' failure to seek and acquire a THC permit to remove the Monument violated section 191.093 of the Antiquities Code.

58.    Defendants' criminal liability for this strict-liability offense was established when they voted to remove the Monument and had it removed. Bradshaw, *San Antonio Removes.*

59.    Councilman Clayton Perry voted against the city council's unlawful resolution and therefore does not share in this liability. *Id.* The criminal liability for the councilmen voting for the unlawful removal of the protected statue is statutorily determined. For each offense, the penalty is a fine of between $50 and $1,000, by confinement in jail for not more than 30 days, or by both. TEX. NAT. RES. CODE ANN. § 191.171(a); Op. Att'y Gen. H-250 at 3 (1974). "Each day of continued violation of any provision of this chapter constitutes a separate offense for which the offender may be punished." TEX. NAT. RES. CODE ANN. § 191.171(b); Op. Att'y Gen. H-250 at 3 (1974).

60.    Since the mayor and city councilmen voted to remove the Monument on August 31, 2017, approximately 280 days have passed. Defendants voted for an unlawful action, thus stripping them of any claim to sovereign immunity and leaving each of them, excepting Clayton Perry, criminally liable for fines that could reach as high as $280,000 per defendant and jail time into many years for removing the oldest memorial to Texas veterans, commemorating a significant event in Texas history and protected under Texas law.

61.     The Monument is a state archeological landmark, because it is a site, object, and historic location of historic interest and education. TEX. NAT. RES. CODE ANN. § 191.092(a); TEX. ADMIN. CODE ANN. § 26.2(4); Op. Att'y Gen. H-250 at 2 (1974).   Texas historic landmarks are the sole property of the State of Texas. TEX. NAT. RES. CODE ANN. § 191.093; Op. Att'y Gen. H-250 at 2 (1974).   This state's ownership interest in landmarks was established to protect them from damage and destruction by government employees and officers, such as the Mayor and City Council of San Antonio. *See* Op. Att'y Gen. H-250 at 4 (1974).   The Monument is not the property of the City of San Antonio. In other words, when defendants took action to remove the Monument, they took action against the property of another and established liability for criminal mischief in their individual capacities, because defendants were acting ultra vires. TEX. PENAL CODE ANN. § 28.03(a).

62.     Defendants' resolution to remove the Travis Park Monument was an infliction of destruction on the tangible personal property of another. Defendants damaged the Monument in removing it. (ECF No. 40-1 at 1-4, 6, 9, 11, 15-18, and 23).   Defendants knowingly and intentionally removed the Monument, as evidenced by defendants' public meetings and press conferences announcing their intent.   Bradshaw, *San Antonio Removes.* Defendants did not have effective consent to remove the property of the State of Texas, nor did defendants seek, nor did they obtain effective consent that statutorily must be obtained solely through the Texas Historical Commission.

TEX. NAT. RES. CODE ANN. § 191.054.  Defendants committed the criminal offense of criminal mischief, because they knowingly and intentionally damaged the personal property of another without effective consent of the owner. TEX. PENAL CODE ANN. § 28.03(a).

63.   Penalties for commission of criminal mischief are determined by the amount of pecuniary loss to the property. TEX. PENAL CODE ANN. § 28.03(b). The value of the Travis Park Monument and cannon is well over $200,000.00.  Where the value of the pecuniary loss is $200,000.00 or greater, the offense is a felony in the first degree.   TEX. PENAL CODE ANN. § 28.03(b)(7).  The penalty for a first-degree felony is "imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years."  TEX. PENAL CODE ANN. § 12.32(a). Additionally, an individual guilty of a first degree felony "may be punished by a fine not to exceed $10,000." TEX. PENAL CODE ANN. § 12.32(b).  Defendants' possible criminal penalties are severe, and rightfully so.  The unpermitted removal of and damage to the oldest work of public art commemorating the sacrifices of American veterans from Texas and protected under Texas law public officers warrants severe sanctions that would deter other miscreant politicians from committing further removals and damage to the revered memory of Texas veterans.

64.   The Texas Antiquities Code authorizes that where public officers unlawfully remove a historic object, citizen-plaintiffs may request "the return

of items taken in violation of provisions of this chapter" be returned. TEX. NAT. RES. CODE ANN. § 191.173(a). The Court should so order that defendants restore and return the Travis Park Monument, the cannon, and the time capsule intact to their original location, as well as refer this case to the Texas Attorney General and the Bexar County District Attorney for criminal prosecution under the Texas Antiquities Code.

## III.   DEFENDANTS HAVE RENDERED THE CHARITABLE GIFTS' PURPOSE IMPOSSIBLE AND MUST, THEREFORE, RETURN THE CHARITABLE GIFTS TO THE DONORS.

### A.   Plaintiffs Have Standing, Because They Have a Special Interest in the Monument, Cannon, and Time Capsule.

65.     People who have a special interest different from that of the general public in the enforcement of a public charitable trust or gift have standing. *Coffee v. William March Rice University*, 403 S.W.2d 340, 343 (Tex. 1966); *Tunstall v. Wormley*, 54 Tex. 476, 481-82 (Tex. 1881); *Gray v. Saint Matthews Cathedral Endowment Fund, Inc.*, 544 S.W.2d 488, 490 (Tex. Civ. App.—Texarkana 1976, no writ); Restatement (Third) of Trusts: Standing to Enforce a Trust § 94 (2012). Special-interest standing in citizens arises from the well known history of attorney-general neglect in the enforcement of public charitable trusts and gifts. Restatement (citing James J. Fishman, *The Faithless Fiduciary and the Quest for Charitable Accountability, 1200-2005* (2007)).

66.     The majority rule for the establishment of special-interest standing is that the plaintiff must show a present claim to benefits, as well as the donees' extraordinary measure threatening the express purpose of the gift. *Hooker v. Edes Home*, 579 A.2d 608, 611-15 (D.C. 1990) (potential beneficiaries to home for aged and indigent had special interest where trustees act threatened existence of trust)); *see also Tunstall*, 54 Tex. at 481-82 (where trustee had only key to church and refused to allow congregation to worship in church, church members had standing to divest trustee of property); *Gray*, 544 S.W.2d at 491 (where plaintiff was parishioner, former vestryman, successor trustee, and contingently liable for debts, plaintiff had special interest in church's financial settlement that threatened endowment); *Family Federation for World Peace v. Hyun Jin Moon*, 129 A.2d 234, 245 (D.C. 2015) (successors in interest to church founder had special interest to contest control of church); Restatement.

67.     Under *Edes Home*, plaintiffs to enforce a charitable trust or gift must show firstly that they are members of the class of present or potential beneficiaries, who are sharply defined and limited in number. *Id.* at 614 (citing *Alco Gravure, Inc. v. Knapp Found.*, 479 N.E.2d 752, 755 (N.Y. 1985); *see also St. John's-St. Luke Evangelical Church v. National Bank*, 283 N.W.2d 852, 858-60 (Mich. App. 1979) (citation omitted); *Gray*, 544 S.W.2d at 491. Secondly, plaintiffs must show that the trustees or donees are proposing "an extraordinary measure[,] threatening the existence of the trust[;] hence[,]

raising an issue that, by its nature, could only be tried once." *Edes Home*, 579 A.2d at 614.

68.     In the instant matter, plaintiffs solidly meet the majority-view requirements for standing under the special-interest exception as defined in *Edes Home*, because they are the intended beneficiaries of the charitable gift and defendant-donees rendered the purpose of the public charitable gifts impossible to continue. *Id.* When Congress donated the cannon to the City of San Antonio in 1908, the gift was made to benefit "the Confederate Camp of this City.". . . (ECF No. 14-1 at 8-9). The Confederate Camp at that time was the Albert Sidney Johnston Camp 144. *Id.* That camp was succeeded by 2 Sons of Confederate veterans Camps: Hood's Texas brigade camp #153 and the Alamo city Guards camp #1325. The Sons of Confederate Veterans is an intended beneficiary of the gift of the cannon, because it is the successor in interest to the United Confederate Veterans. Appendix .

> A third-party beneficiary who is intended to benefit from a contract and thus acquires rights under the contract as well as the ability to enforce the contract once those rights have vested.

Black's Law Dictionary 186 (10th ed. 2009).

Plaintiffs are small in number and an identifiable group, the descendants of the veterans the Monument commemorates and whose names all appear on the SCV roll.   Plaintiffs are present beneficiaries, because they were so named in the grant and, therefore, meet the first prong of the *Edes Home* test. 579 A.2d at 614.

69.     Plaintiffs meet the second prong of the *Edes Home* test, because defendants have taken an extraordinary measure by removing the Monument and cannon from Travis Park.  The Monument was placed in perpetuity to commemorate American veterans of the Civil War.  (ECF No. 14-1 at 3).  The same is true of the cannon, which were and always have been, from the time of the public charitable gift, intended to accompany the Monument.  (ECF No. 14-1 at 8-9).   Plaintiffs have a special interest in the cannon and the Monument as lineal descendants to the men commemorated in the gifts, possessing standing to contest defendants' removal of the cannon and Monument and to enforce the continued display of the cannon and Monument in Travis Park and the continued display of the political speech that communicates a commemorative message of their ancestors.   Defendants' removal of a monument that defendants had agreed would remain in perpetuity in order to terminate political speech is an extraordinary act, because it is a facial denial of free speech that defendants are obligated to preserve not undermine.

70.     The minority view of special-interest standing in the courts has been to liberally grant standing to members of groups, where a serious breach of the trust or gift is threatened and the attorney general declines to bring suit. Restatement. When a citizens group sued the City of Honolulu to prevent the construction of a restaurant in Kapiolani Park, wedged between Waikiki and Diamond Head, and the Attorney General sided with the City,

the Hawaii Supreme Court ruled that the citizens had special-interest

standing:

> Where a trustee of a public charitable trust is a governmental
> agency, such as the City, and that agency does not file periodic
> accounts of its stewardship, and will not seek instructions of the
> court as to its duties, even though there is a genuine controversy
> as to its power to enter into a particular transaction, and where,
> in such a case, the attorney general, as parens patriae has
> actively joined in supporting the alleged breach of the trust, the
> citizens of this State would be left without protection, or a
> remedy, unless we hold, as we do, that members of the public, as
> beneficiaries of the trust, have standing to bring the matter to
> the attention of the court.
>
> Were we to hold otherwise, the City, with the concurrence of the
> attorney general, would be free to dispose, by lease or deed, of
> all, or parts of, the trust comprising Kapiolani Park, as it chose,
> without the citizens of the City and State having any recourse to
> the courts.  Such a result is contrary to all principles of equity
> and shocking to the conscience of the court.

*Kapiolani Park Preservation Society v. City and County of Honolulu*, 751
P.2d 1022, 1025 (Haw. 1988).

71.     A citizens group of five sued to amend the environmental-clean-

up procedure of storm damage in Baxter State Park, Maine.  *Fitzgerald v.*

*Baxter State Park Authority*, 385 A.2d 189, 193 (Maine 1978).  This group

had special-interest standing, because each person made frequent use of the

park and the attorney general was prohibited from joining suit. *Id.* at 195.

> The subgroup of Maine people who are actual users of the Park,
> itself substantial in number, is sufficiently large to assure that
> the public's interest in administration of the Park in compliance
> with Governor's Baxter's [the donor's] wishes will be adequately
> represented.  Any citizen of Maine who shows himself to have
> suffered "particularized injury" as a result of action of the
> Baxter State Park Authority has standing to obtain judicial
> review and to seek injunctive relief against the proposed action.

*Fitzgerald*, 385 A.2d at 197.

72.     The Texas Legislature has also provided for liberal standing in the protection of historic landmarks and sites. The Texas Antiquities Code provides standing to any "citizen of Texas" to bring suit for restraining orders and the return of items taken in violation of the code. TEX. NAT. RES. CODE § 191.173(a).     Protected items include "all sites, objects, buildings, pre-twentieth century shipwrecks, and locations of historical, archeological, education, or scientific interest.". . . *Id.* at § 191.002. Clearly, the Travis Park Monument is a state archeological landmark, as discussed supra. Standing to protect the Monument is statutorily provided under the Texas Antiquities Code and should also be liberally provided to those plaintiffs with a special interest in the preservation of historic monuments. The Texas Attorney General has not intervened in this case, and, without enforcement of the public charitable gifts by citizens of Texas, defendants could freely distribute these gifts to third parties, thereby defeating the purpose of public charity and providing a powerful incentive to potential donors that when defendants defy the terms of a charitable gift given to benefit the public, the terms of such gifts will have no effect subsequent to the benefactors' demise. This outcome would be contrary to all principles of equity and shocking to the conscience of the court, as well as contrary to public policy declared in the Texas Antiquities Code.

73.     Plaintiffs have special-interest standing under the majority

*Edes Home* test, but also have standing under the minority test, due to the Texas Attorney General's absence in this case and the lack of enforcement of a public charitable trust that plaintiffs have a special interest to protect and that would shock the conscience were enforcement be left solely to the offending defendants, who violated the Texas Antiquities Code, the federal Constitution, and the express terms of donors to public charity.

### B. Defendants Have Caused the Charitable Public Gifts to Fail and Must, Therefore, Return the Gifts to Their Donors, as Provided for in Circuit-Courts-of-Appeals Opinions.

74.    Phebe Ferris devised her estate and lands to the Peabody Museum "to be kept and held in trust by that corporation in perpetuity 'for scientific purposes for the preservation of the remains and relics of said cemetery.'" *President and Fellows of Harvard College v. Jewett*, 11 F.2d 119, 121 (6th Cir. 1925). The will required that the remains and relics were to be kept on site for display, on the land in Ohio. *Id.*

75.    The Peabody Museum accepted the devise and perpetual trust, but then removed the remains and relics from Ohio and placed them in its museum in Cambridge, Mass., after Mrs. Ferris' demise. *Id.* at 122. The trustee of the public charitable gift made the further performance of the trust impossible by removing the trust corpus from the designated repository site in Ohio without testamentary authority. *Id.* "[T]he plain and positive language of the devise indicates a wholly different intent and purpose [from that of the trustee], and it is the intent and purpose of the testatrix, and not

the intent and purpose of the trustee or the court that must control." *Id.*
(citing *Colton v. Colton*, 127 U.S. 300, 309 (1888)). "A court may not deprive
this testatrix of her right to make a will by a construction wholly at variance
with the plain import and the usual and ordinary meaning of the words
used." *Id.*

> It does not appear from the record that, through any natural or
> unavoidable change in conditions or circumstances, the land
> devised is not now as fit and suitable for the preservation of
> these remains and relics as it was at the time the will was
> written, but rather that, by reason of the action of the trustee in
> removing these relics, its further use for the purpose of the trust
> has become unnecessary and impracticable.   This presents no
> case for the application of the cy pres doctrine. (citations
> omitted).

*Jewett*, 11 F.2d at 122.

The trustee of the public charitable gift made further performance of the
trust impossible, and the trust corpus, therefore, reverted to the testatrix'
estate and was distributed among her beneficiaries. *Id.* at 123.

76.    In 1927, Anna Shoemaker bequeathed her residuary estate to a
trustee to fund a retreat for "friendless maiden ladies" in the District of
Columbia. *Shoemaker v. American Security & Trust Co.*, 163 F.2d 585, 586
(D.C. Cir. 1947).  Mrs. Shoemaker's will provided for the perpetual care of
these ladies at the retreat, which was to be erected on her property at the
corner of Wisconsin Avenue and Brandywine Street, and no where else. *Id.*
After almost twenty years, the trustee had still not begun construction for the
retreat, and Shoemaker's beneficiaries contended that the trust had failed

through the trustee's inaction and that the property reverted to them, in accordance with the reverter clause in her will. *Id.* at 587. The trial court asserted that the properties were no longer suitable for a retreat and, invoking the court's jurisdiction under cy pres, directed the trustee to sell the lots and build elsewhere. *Id.* The beneficiaries appealed. *Id.* at 588. The court of appeals ruled that:

> if a testator establishes a charitable trust and designates a site to be used, and[,] if it appears that his dominant or primary intent was the use of the designated site for the described purpose, a court cannot direct the establishment of the charity at another site. . . .

> [I]f the primary intent of the testator was the use of a designated property or a benefit to a designated community, the trust fails[,] if that property or the charity in the named community becomes impossible or impracticable.

*Shoemaker*, 163 F.2d at 588.

77. In a final case, Mary Crozier bequeathed $300,000.00 to build a memorial hall to be used as a meeting and lodging place for graduates of the United States Military Academy to be named Crozier Hall in memory of her late husband, Major General William Crozier, a member of the Class of 1876. *Connecticut College v. United States*, 276 F.2d 491, 492-93 (D.C. Cir. 1960). Mrs. Crozier designated that the memorial hall be erected "on a site south of Fort Clinton and north of the Bachelor Officers' Quarters on the general level of the Plain, in accordance with plans and specifications to be approved by the Superintendent of the United States Military Academy.". . . *Id.* at 493. Mrs. Crozier named Connecticut College the beneficiary of her residuary

estate. *Id.* Three years after Crozier's death, the United States of America filed suit under the cy pres doctrine to reform Mrs. Crozier's gift "to permit the plaintiff to use the funds so bequeathed for a purpose similar to that contemplated by the testatrix.". . . *Id.* The United States averred that:

> the contemplated expansion program of the Military Academy require[s] that Fort Clinton be reserved for expansion purposes. . . . Thus, it is necessary at the present time to declare the Fort Clinton area as unavailable as contemplated by the testatrix.

*Connecticut College*, 276 F.2d at 494.

The trial court allowed the site to be changed from that designated by Crozier and also authorized the bequest funds be used for the construction of a wing on another building and not for a separate memorial hall for alumni. *Id.* at 495. The D.C. Circuit Court of Appeals reversed and remanded the trial court's decision stating that:

> The *cy pres* doctrine does not authorize or permit a court to vary the terms of a bequest and to that extent defeat the intention of the testator merely because the variation will meet the desire and suit the convenience of the trustee. . . .

> Nor may a trustee by his own act produce changed conditions which frustrate the donor's intention and still claim the gift through the application of the *cy pres* doctrine.

*Connecticut College*, 276 F.2d at 497.

> Neither of the Government's affiants said it had become impossible or impracticable to use the site specified by Mrs. Crozier. They merely said the Military Academy authorities, who initially approved and earmarked the site chosen by the testatrix, had later declared it unavailable because they had changed their minds by 1958 and had decided to reserve the area for another purpose. . . .

> Their decision was not said to have been dictated by the
> occurrence of events over which they had no control. It was due
> apparently to a voluntary change in policy, which may have
> been wise but is not shown to have been inevitable.

*Connecticut College*, 276 F.2d at 498.

Mrs. Crozier's bequest, thereupon, reverted to her residuary estate and

thence to Connecticut College, the beneficiary of the residuary estate.

77.    In the instant matter, the UDC, made a charitable public gift to

defendants of the Monument to be placed in Travis Park and in Travis Park

only in perpetuity. (ECF No. 14-1 at 3).  Defendants accepted and have been

displaying the Monument there ever since.  *Id.*  A time capsule was put in the

Monument's base at its dedication, and the cannon were added nine years

later in 1908.  (ECF No. 14-1 at 8-9).  Defendants have made the further

display of the Monument and cannon impossible by removing them.   No

events, nor circumstances required defendants to remove the Monument, but

only defendants' contention that the Monument was offensive.  Huddleston,

*New Home.*  Since defendants have voluntarily rendered the purpose of the

public charitable gifts impossible to further fulfill, the Monument, cannon,

and time capsule should all revert to their donors, or transferred to intended

beneficiaries, in their intact condition prior to removal.  *Connecticut College*,

276 F.2d at 498; *Shoemaker*, 163 F.2d at 588; *Jewett*, 11 F.2d at 122.

IV.   TITLE TO THE CANNON IN TRAVIS PARK RESTS IN THE SONS OF
CONFEDERATE VETERANS, AND THE CITY CONVERTED THE
CANNON AND THE TIME CAPSULE
WHEN THE CITY REMOVED THE MONUMENT.

78.   The City accepted the two artillery field pieces for the Confederate
Camp of San Antonio. (ECF No. 14-1 at 8-9).   The Camp decided the
disposition of the two field pieces and defendant City agreed to place the field
pieces, one on each side of the Confederate Veterans Monument in Travis
Park.   *Id.*   The cannon have stood in Travis Park, beside the Monument for
the last 110 years.   *Id.*

79.   When the City removed the cannon and the time capsule in the
foundation stone, the City and its agents tortiously converted the objects.

> Tortious conversion is the wrongful possession or disposition of
> another's property as if it were one's own; an act or series of acts
> of willful interference, without lawful justification, with an item
> of property in a manner inconsistent with another's right,
> whereby that other person is deprived of the use and possession
> of the property.

Black's Law Dictionary 382 (10th ed. 2009).

> [Tortious conversion] does not include mere acts of damage, or
> even an asportation which does not amount to a denial of the
> owner's right of property, but it does include such acts as taking
> possession, refusing to give up on demand, disposing of the
> goods to a third person, or destroying them.

Black's Law Dictionary 382 (10th ed. 2009) (quoting William Geldart,
*Introduction to English Law* 143 (D.C.M. Yardley ed., 9th ed. 1984)).

80.   The City tortiously converted the field pieces, because title to
the pieces resided in the SCV, the successor association of the United
Confederate Veterans (UCV), when the City removed the cannon.   Indeed,

the City Council voted to remove the Monument, not the cannon, and the cannon should have either remained in Travis Park or have been returned to the SCV. The cannon were placed beside the Monument eight years after the Monument's erection and had an entirely separate provenance than the Monument.

### F. ATTORNEYS' FEES AND COSTS

81.    Plaintiffs are entitled to an award of attorney fees and costs under 28 U.S.C. § 1988.

### G. PRAYER

82.    For these reasons, plaintiffs ask that the Court do the following:

    a.    Enter a declaratory judgment that defendants' action in removing the Travis Park Monument and the SCV cannon violated plaintiffs' constitutional right to freedom of speech, guaranteed in the First Amendment to the U.S. Constitution;

    b.    Enter a declaratory judgment that defendants' action in removing the Travis Park Monument and the SCV cannon violated the Texas Antiquities Code;

    c.    Enter declaratory judgment that the Sons of Confederate Veterans have legal title in the cannon and the memorial artifacts described in the *San Antonio Sunday Light*;

d.      Order specific performance against defendants that defendants must at their own expense repair and replace the Travis Park Monument, the SCV cannon, and the replaced and improved time capsule to their original and perpetual site in Travis Park, such restoration and replacement to be overseen by Tatti Art Conservation of New York, New York;

e.      Enter judgment for plaintiffs;

f.      Award attorney costs to plaintiffs;

g.      Award costs of suit to plaintiffs; and,

h.      Grant any other relief the Court deems appropriate.

Respectfully submitted this 11th day of June 2018.

Respectfully submitted,

s/ David D. Vandenberg
Texas Bar No. 24107948
Vandenberg Law, PLLC
3603D Las Colinas Drive
Austin, Texas 78731
Tel. (512) 373-8694
davidvandenberg@hotmail.com

s/ Warren V. Norred
Texas Bar No. 24045094
Norred Law, PLLC
515 East Border Street
Arlington, Texas 76010
Tel. (817) 704-3984
Fax (817) 524-6686
wnorred@norredlaw.com