---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS,
# SAN ANTONIO DIVISION

---

| | | |
|---|---|---|
| Richard Brewer, et al., | § | |
|    *Plaintiffs,* | § | |
| | § | |
| *v.* | § | Civil Action No. 5:17-CV-00837-DAE |
| | § | |
| Ron Nirenberg, et al., | § | |
|    *Defendants.* | § | |

——————————————————————————————————

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT[1]

---

Plaintiffs ask the Court to deny defendants' motion for final summary judgment.

## A.  INTRODUCTION

1.    Plaintiffs are Richard Brewer and the Texas Division, Sons of Confederate Veterans, Inc.; defendants are Ron Nirenberg, Roberto Trevino, William Shaw, Rebecca Viagran, Rey Saldana, Shirley Gonzales, Greg Brockhouse, Ana Sandoval, Manny Pelaez, John Courage, and Clayton Perry.

2.    On August 30, 2017, plaintiffs sued defendants for invidious viewpoint discrimination under the First Amendment, for violation of the

---

[1]  Defendants erroneously challenge plaintiffs' standing in their motion for summary judgment.  If plaintiffs lack standing, the Court lacks subject-matter jurisdiction to rule on the motion for summary judgment.  *See State Farm Mut. Auto. Ins. v. Dyer,* 19 F.3 514, 518 (10th Cir. 1994).  Plaintiffs respond to defendants in the form of an objection to a 12(b)(1) motion to dismiss to avoid jurisdictional problems for the Court.

Texas Antiquities Code, for rendering impossible a public charitable gift requiring transfer of the gift corpus to plaintiffs, and for conversion of the gift corpus. (ECF No. 1). On June 22, 2018, plaintiffs filed their second amended complaint. (ECF No. 44).

3.     On December 4, 2017, defendants answered plaintiffs' complaint. (ECF No. 19). On July 16, 2018, defendants filed their motion for summary judgment, or alternatively, motion to dismiss on plaintiffs' alleged lack of standing. (ECF No. 54).

4.     Summary judgment is improper in this case, because there are genuine disputes of material fact on each element of plaintiffs' claim for standing. Plaintiffs have experienced an injury-in-fact that is concrete and particularized, actual or imminent and not conjectural or hypothetical. A causal connection exists between the injury and defendants' conduct that is fairly traceable to the defendants' challenged action. And it is likely that plaintiffs' injury will be redressed by a favorable decision.

## B. ARGUMENT

5.     Plaintiffs experienced an injury-in-fact that is concrete, particularized, and actual when the defendants had the Travis Park Monument and cannon removed that expressed plaintiffs' and defendants' jointly established political viewpoint since 1908. The Texas Division, Sons of Confederate Veterans, Inc., (SCV) is a heritage association that erects and preserves memorials to Confederate and Union soldiers and sailors, who

served in the Civil War, for the express purpose of communicating political speech about the Civil War.  Plaintiffs perform these expressive acts in ongoing collaboration with government actors, including the United States, the State of Texas, and the City of San Antonio.

6.    The SCV collaborates with the federal government in maintaining Civil War graves and cenotaphs across Texas.  Member Activities, Texas Division, Sons of Confederate Veterans, http://www.scvtexas.org/Member_Activities.html (last visited August 6, 2018).  The federal Department of Veterans Affairs has recognized the SCV as a "lineage society" that maintains veterans graves and is authorized to request VA headstones for such unmarked graves.  Applicants for VA Memorialization Benefits, 81 Fed. Reg. 41 (Mar. 2, 2016) (to be codified at 38 C.F.R. pt. 38).  Other organizations that can request a VA headstone are the Daughters of the American Revolution, the General Society of the War of 1812, and the Sons of Union Veterans of the Civil War.  *Id.*  Congress has recognized the SCV's role in the United States Code as an association with unique competency in the marking and maintenance of veterans' graves.  *Id.*

7.    The SCV has collaborated with the State of Texas in marking and protecting Confederate graves at Ft. Lancaster State Historic Site, Exhibit A; in restoring historic markers with the Texas Historical Commission damaged by vandals, Exhibit B; and in commemorating the

centennial of the Civil War with the Governor and the Texas Centennial Commission, Exhibit D.

8.      The SCV currently collaborates with the City of San Antonio in repairing damage to and maintaining city-owned cemeteries, aas well as participating in historic re-enactments at the Alamo and other historic sites. Exhibit E.

9.      The SCV, as successor in interest to the United Confederate Veterans (UCV), has a lengthy history of protecting and communicating Confederate veterans' political beliefs through memorials and graves since 1889.   What is the SCV, Texas Division, Sons of Confederate Veterans, http://www.scvtexas.org/What_Is_The_SCV.html (last visited August 8, 2018); Exhibit E.   The SCV's mission to protect brothers-at-arms, their memories, and their political viewpoint has known no racial distinctions, as white veterans actively protected their black brothers' interests from early on. *Negro Confederate Veteran* Shot, N.Y. Times, June 15, 1900.  Exhibit F. After a black Confederate veteran, Henson Williams, and his son William were shot dead while working on their farm in Brazos County, the white Confederate veterans in the area threatened vengeance on the murderer of their brother.   *Id.*   Blacks, both free and bond, proudly served in the Confederate armed forces and their descendants are members of the SCV.  *Id.*

10.     The SCV maintains Confederate graves, cenotaphs, and memorials in cemeteries and parks and the political viewpoint they express

across Texas and the U.S.  Member Activities, Texas Division, Sons of Confederate Veterans, http://www.scvtexas.org/Member_Activities.html (last visited August 6, 2018); Exhibits A, B, C, D, & G.  The SCV also fosters the commemoration of Confederate monuments, memorials, and veterans' graves through the bestowal of awards on persons who have worked to promote Confederate values, such as honor, service, and courage.  Exhibit D.

10.    The SCV promotes its political viewpoint by the maintenance of Civil War graves, cenotaphs, and memorials on private and public property across Texas.  Exhibits A, B, C, & D.  These activities include marking graves, restoring headstones, re-erecting monuments, and erecting new monuments.  *Id.*  The activities commemorate Confederate veterans and maintain the political speech communicated through these graves and memorials.  The SCV has conducted the following actions in the last year to commemorate Confederate veterans, Confederate history, and to communicate their political speech:

a.    On July 27, 2018, the SCV erected a battle cross on a Confederate grave in the public cemetery in McDade, Texas. Exhibit D.

b.    On June 4, 2018, SCV members, including Tejano members, presented the Hunley Award to JROTC Cadet Major Castillo at Rio Hondo High School for honor, courage, and commitment.  *Id.*

c.      On June 2, 2018, SCV members dedicated a bench for the Confederate Memorial, which the SCV erected only a few years earlier, in the oldest public cemetery in Austin, Oakwood Cemetery. *Id.*

d.      On May 16-17, 2018, SCV members presented ten leadership awards to high-school JROTC cadets, including black and Tejano students, to promote Confederate values. *Id.*

e.      On April 29, 2018, SCV members decorated graves in the public Confederate Cemetery in San Antonio as an annual event. *Id.*

f.      From April 13-14, 2018, SCV members participated in a historic Civil War reenactment at Fort Ingle in Uvalde, dressing as both Confederate and Union soldiers. *Id.*

g.      On April 10, 2018, SCV members reset vandalized headstones in the public Confederate Cemetery in San Antonio. *Id.*

h.      On March 24, 2018, SCV members restored the private Galliard-Mitchell Cemetery in Baytown that was severely neglected and reset federal VA headstones.  When the SCV restores cemeteries, all graves are restored and the entire cemetery is cleared, not only Confederate graves. *Id.*

i.      From March 6-10, 2018, SCV members dressed as Texan volunteers and Mexican soldiers to participate in the annual commemoration of the Battle of the Alamo. *Id.*

j.    On Feb. 28, 2018, members of the SCV provided a living history presentation in a Corpus Christi high school. *Id.*

k.    On Feb. 1, 2018, SCV members located an unmarked Confederate grave and set a new federal VA headstone at the private Old Bethel Cemetery in Bryan. *Id.*

l.    On Dec. 7, 2017, SCV members presented an Award of Excellence to the San Antonio Police Department that officers proudly accepted. *Id.*

m.    On Nov. 13, 2017, SCV members reset old and placed a new federal VA headstone on Confederate graves at private Tryon Cemetery in Brazos County. *Id.*

n.    On Nov. 10, 2017, SCV members cleaned up the public Confederate Cemetery in San Antonio, as they do annually. *Id.*

o.    On Oct. 30, 2017, SCV members cleared private Ebenezer Cemetery in Brazos County, resetting all headstones Confederate or otherwise. *Id.*

p.    On Oct. 14, 2017, SCV members participated in a rally to save the Alamo cenotaph. *Id.*

q.    On Aug. 12, 2017, SCV members participated in a Travis Park Monument support rally. *Id.*

The SCV erects and restores Confederate monuments in collaboration with Texas state agencies and municipalities in order to preserve the political viewpoint expressed through the monuments.

11.     Cenotaphs, such as the Travis Park Monument and the Spirit of Sacrifice, the Alamo Cenotaph, serve the same expressive purposes as a cemetery in communicating the SCV's political viewpoint, but are erected when the remains of the dead are lost or unavailable.  The cenotaph at Travis Park serves to honor the Confederate dead and to express the political viewpoint of citizens of San Antonio relative to the Civil War.  Defendants mischaracterize the purpose of the Travis Park Monument/Cenotaph as glorifying the Confederacy and racism.  (ECF No. 54 at 1, 18).  This is because defendants have erroneously conflated the political reasons for secession with the personal reasons common soldiers in the South had in fighting the Civil War.  The Travis Park cenotaph was erected in memory of the individual soldiers and sailors of Texas who fought for the South, not to the corporate political entity of the Confederacy.  Southern soldiers usually fought because they saw their country invaded by a foreign army, not because they wished to enslave others.[2]

12.     The SCV communicates the firmly documented historical viewpoint that the Civil War was not fought to abolish slavery.  Andrew Glass, *Congress Declares Civil War's Aims July 25, 1861* Politico (July 25,

---

[2]  James Ronald Kennedy &Walter Donald Kennedy, The South Was Right! and James M. McPherson, What They Fought for 1861-1865.

2007, 6:04 AM).  The U.S. Congress declared that the purpose of the Civil War was not to abolish slavery, and individual Confederate soldiers, therefore, could not have been fighting to preserve slavery, as defendants suggest; rather, they were fighting for their right to secede in times of what they viewed as unconstitutional federal actions.  It is this historic political viewpoint of constitutional supremacy and compliance therewith that the SCV has been promulgating through its sundry cemetery and memorial projects across Texas for the last 130 years.

13.    In early February 2017, vandals damaged a series of Texas Historical Commission markers between Llano and San Angelo.   Joe Pappalardo, *No One Around to Foot the Bill When Vandals Target Texas' Historical Markers*, The Dallas Observer (March 3, 2017, 4:00 AM), https://www.dallasobserver.com/news/no-one-around-to-foot-the-bill-when-vandals-target-texas-historical-markers-9238746.  When the Texas Historical Commission (THC) did not have the funds to repair the damaged markers, Bob Brinkman, the Coordinator of the Historical Markers Program, contacted Mr. David McMahon, SCV Commander of the Texas Division, and a certified expert in the repair of historic markers and gravestones.  Exhibit B.  The THC requested SCV expertise in monument repair.  *Id.*  McMahon, his wife, and Bob Brinkman personally repaired the vandalized markers.  *Id.*  None of the markers concerned the Civil War; still, David McMahon repaired these markers that expressed a political viewpoint of historic events independent of

the Civil War, because the vandals' graffiti promoted a Marxist political viewpoint of American political history over the original American political viewpoint that the SCV and its members communicate. The graffiti prevented the State's and the SCV's collaborative political viewpoint from being expressed; McMahon's repairs restored the original American viewpoint of the settlement of the Hill Country to the state-owned markers. *Id.*

14. The UCV and its successor in interest, the SCV, have maintained and expressed the political viewpoint expressed in headstones and memorials for over 130 years. Exhibit A, B, C, D, & H.

    a. In 2013, SCV members cleaned, painted the sign, and re-set the memorial in the public Confederate Cemetery in Dallas. Exhibit H.

    b. In 1998, SCV members paid for and erected a monument to the Civil War dead buried in Pecan Grove Cemetery in McKinney, the city's oldest public cemetery. *Id.* The monument listed the names of seventy-three Confederate and two Union veterans. *Id.* Union and Confederate re-enactors took part in the monument's dedication and the Collin County Historical Commission thanked the SCV for their work in the cemetery. *Id.*

c.  In 1964, SCV members participated in the centennial commemoration of the Civil War.  Exhibit C.  Gov. John Connally wrote that "Even a short glance will show that Texas contributed her share of men and women of moral fiber and high morale." Centennial Commemoration Program.  *Id.*

d.  In 1908, the UCV camp in San Antonio decided by consensus that the two field cannon that the U.S. Congress had presented to the City of San Antonio for the benefit of the Confederate camp of the city should be placed on either side of the Travis Park Monument.  (ECF No. 14-1 at 8-9).  Those cannon remained on either side of the Travis Park Monument for 110 years, that is, until defendants removed them in an act of unconstitutional government overreach.  Defendants unconstitutionally removed the Monument and cannon, because they objected to plaintiffs' political viewpoint expressed by the Monument group that citizens of Texas and San Antonio have the right to defend the U.S. Constitution and their homes by force of arms from their own government acting unconstitutionally.

15.  Defendants' removal of the Travis Park Monument and cannon impermissibly impaired plaintiffs' political viewpoint.  The U.S. Congress gave the cannon to defendants for the benefit of the Confederate camp of San

Antonio.  (ECF No. 14-1 at 8-9).  The SCV, as successor association to the UCV, is the intended beneficiary of the public charitable gift and has standing by virtue of this relationship alone.  (ECF No. 44 at 29-34).  More=over, when plaintiffs and defendants agreed to place the cannon beside the Monument and defendants did place the cannon in the UCV-directed position, the political viewpoint of cannon and Monument fused.  Defendants removed the cannon and Monument as a group and store them as a group.  Exhibit F.  Had the cannon been standing alone without the Monument, they would communicate mere military power in a historical context.  But once plaintiffs' predecessors in interest directed and defendants placed the cannon on either side of the Travis Park Confederate Monument, the cannon's speech of historic military power fused with the Monument's speech commemorating Confederate dead, creating a synergy between the Monument's and the cannon's political message of the righteousness of military resistance to government tyranny.

16.    Plaintiffs' First Amendment right to communicate their political viewpoint was established when defendants agreed to place the cannon beside the Travis Park Monument, as plaintiffs' predecessor in interest directed.  (ECF No. 14-1 at 8-9).  In *Serra v. United States General Services Admin.*, the court ruled that when an artist sold his art work to the government, the artist had a limited First Amendment right in the art even when the artistic expression belongs to the government and is government

speech, when the government seeks to *remove* the public art.  847 F.2d 1045, 1048 (2nd Cir. 1988).  In the instant matter, the transfers of the Monument and cannon to defendants were made by two separate public charitable gifts and not by purchase, which arguably conferred greater control over the artistic medium to intended beneficiaries than an outright sale by the artist.

17.     In order to remove the artwork, the government must have met the requirements for permissible time, place, and manner restrictions.  *Id.* at 1049.    The *Serra* court stated that "Streets and public parks 'have immemorially been held in trust for the use of the public, and time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Id.* at 1049 n. 1 (quoting *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 469 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939))).  Defendants' acceptance of the cannon from Congress and display of the cannon for 110 years with the Monument has been done in trust for the intended beneficiary plaintiffs, who have standing to sue to enforce their defined benefit of display of their political speech and prevent the Monument group's removal.

18.     The Travis Park Monument and cannon are a memorial group placed by agreement between plaintiffs' predecessor in interest and defendants in order to communicate a political viewpoint.  When a plaintiff controls some interest in an expressive object, the government can remove the object from a public forum or from a government forum, but not "in a

narrowly partisan or political manner" when the government dislikes the ideas expressed by the object. *Serra*, 847 F.2d at 1051 (quoting *Board of Education v. Pico*, 457 U.S. 853, 870 (1982)).  The government may not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872 (quoting *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 642 (1943)).  Any restrictions of speech in a memorial object that expresses political viewpoint must be "justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication for the information." *Serra*, 847 F.2d at 1049 (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1983)).  Defendants' removal of the Monument group impermissibly impaired plaintiffs' free speech. *Serra,* 847 F.2d at 1048-49.

19.    Defendants assert that *Pleasant Grove City, Utah v. Summum* and the court's analysis of the government-speech doctrine controls in the instant matter.  555 U.S. 460 (2009) (ECF No. 54 at 13-14).  However *Summum* is factually distinguishable from the instant matter for three reasons.  (1) The Summum monument was a written text and had no artistic, nor political content.  In contradistinction, the Travis Park Monument group is almost purely artistic expression with little written text.  Since *Summum* does not consider artistic, nor political speech, its use as a rule in the instant

matter would be inappropriate.  (2) *Summum* does not analyze the exception to the government-speech doctrine for artistic and political speech and, therefore, does not avail in considering the instant facts, nor plaintiffs' claims.  (3) Most significantly, *Summun* analyzes the attempted gift and placement of a permanent monument to a municipality.  The *Summum* court held that "The placement of a permanent monument in a public park is a form of government speech and is therefore not subject to scrutiny under the Free Speech Clause."  *Id.* at 460-61, 470-72.

20.    The instant matter is not about the *placement* of a permanent monument, but rather the *removal* of permanent monument whose speech the government has communicated for 110 years by agreement with plaintiffs.  The *Summum* court established the rule that "[g]overnment decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech."  *Id.* at 472.  The *Summum* court held that "[t]he City's decision to *accept* certain privately donated monuments while rejecting respondent's is best viewed as form of government speech."  *Id.* at 481 (emphasis added).

21.    The question as to whether the government can terminate speech that intended beneficiaries have expressed in a public monument for

over a century that the beneficiaries established jointly with the government

is a matter of first impression and not considered in *Summum*. The bounds

of the newly minted government-speech doctrine are far from being worked

out. *Id.* at 485-86 (Souter, J., concurring). Where a public charitable gift has

been made to the government, the government has accepted the gift, and the

government subsequently repudiates the gift and uses it for other purposes—

as in the instant matter—the donee may not profit from rendering the public

charitable gift impossible. *Connecticut College v. United States*, 276 F.2d

491, 497-98 (D.C. Cir. 1960); *see also President and Fellows of Harvard

College v. Jewett*, 11 F.2d 119, 121 (6th Cir. 1925); *Shoemaker v. American

Security & Trust Co.*, 163 F.2d 585, 586 (D.C. Cir. 1947). The *Summum* court

did not consider the removal of permanent monuments and the concerns of

probate, trust, and contract law in their removal. *Summum* will little avail

an analysis of this question, if at all. Since the legal requirements for the

removal of permanent monuments has not been considered and precedent

does not allow the government to render a public charitable gift impossible

without penalty, plaintiffs have standing to assert their rights against

defendants as intended beneficiaries of a public charitable gift. *Connecticut

College*, 276 F.2d at 499.

22. Plaintiffs experienced an injury-in-fact that is concrete and

particularized. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Defendants impermissible restriction of plaintiffs' right to expression of their

political viewpoint is a restriction of a legally protected interest. *Id.* Defendants also injured plaintiffs by rendering impossible the public charitable gift of political speech intended to benefit plaintiffs and expressed by the Monument group.

23.   The injury was concrete. *Spokeo, Inc. v. Robins*, 578 U.S. ___ , ___ (2016) (quoting *Lujan*, 504 U.S. at 560). Defendants' removal of the Monument group, denying plaintiffs' right to expression of their political viewpoint, was an actual injury, because plaintiffs' means of expression was removed, resulting in an impermissible restriction of plaintiffs' speech and plaintiffs' injury. *Spokeo*, 578 U.S. at _____ (slip op. at 9) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009); *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520 (1993)); *see also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 109-15 (1979). Congress' intended benefit of political speech to the Confederate camp of San Antonio, communicated through the cannon associated with the Monument, was silenced by defendants' removal of the Monument ensemble.

24.   The injury was particularized. *Spokeo*, 578 U.S. at ____ (slip op. at 7) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (additional citations omitted). A particularized injury is one that "affect[s] the plaintiff in a personal and individual way." *Id.* Defendants' removal of the Monument group terminated the political speech that defendants and plaintiffs had jointly established in 1908. This injury is particularized, because no one else

was involved in the mutually joined speech act of placing the Monument ensemble, except plaintiffs and defendants.  So, when defendants removed the Monument group and terminated plaintiffs' jointly established political speech, it was plaintiffs alone whom defendants injured, because plaintiffs had directed the establishment of the speech act and defendants acted in agreement for 110 years.

25.   The injury was actual.  *Spokeo*, 578 U.S. at ____ (slip op. at 6) (citing *Lujan*, 504 U.S. at 560).  A violation of a person's legal rights can satisfy the "injury-in-fact" requirement.  *Spokeo*, 578 U.S. at ____ (Thomas, J., concurring at 6) (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978)).  Defendants impermissibly restricted plaintiffs' right to expression of their political viewpoint that they established jointly with defendants in Travis Park in placement of the cannon beside the Monument.  The Monument's removal was an impermissible restriction of plaintiffs' speech and, therefore, satisfies the injury-in-fact requirement for standing, including actual injury.

26.   Plaintiffs' injury is fairly traceable to defendants' action and is not the result of the independent action of a third party.  *Spokeo*, 578 U.S. at ____ (slip op. at 6) (citing *Lujan*, 504 U.S. at 560).  Plaintiffs' injury was defendants' removal of the Monument group that terminated plaintiffs' and defendants' agreed communication of their political viewpoint.

27.   It is likely that plaintiffs' injury will be redressed by a favorable decision.  Plaintiffs are requesting the Court to order defendants to restore

the status quo ante by returning the Monument group to its original site. This act would restore the plaintiffs' intended benefit of Congress' public charitable gift to defendants of the cannon expressing political speech fused with the Monument's political speech.

28.   Plaintiff Brewer has tax-payer standing.   Plaintiff Brewer incorporates his argument for tax-payer standing in the Second Amended Complaint.   (ECF No. 44 at 10-11).   Plaintiff Brewer also submits his affidavit of payment of property tax to the City of San Antonio since 2002 to prove that he is a taxpayer.  *Ehm v. San Antonio City Council*, 269 F. App'x 375, 377 (5th Cir. 2008); Exhibit J.   Plaintiff Brewer also submits proof of defendants' payment of tax revenue to remove the Monument group.   Exhibit F.   Defendants' expended tax revenue in removing the Monument group, as evidenced in their ordinance, contract, and billing for third-party removal services.   Exhibit I.

29.   Plaintiff Brewer has standing under the Texas Antiquities Code to bring suit.   The Code provides statutory standing for a citizen of Texas. TEX. NAT. RES. CODE ANN. § 191.173.   Richard Brewer is a citizen of Texas. Exhibit J.   The Travis Park Monument group was an unidentified Texas landmark and subject to protection under the Texas Antiquities Code. Landmarks on state or local public land are protected whether they are identified or not.   TEX. ADMIN. CODE § 26.2(3).   The Monument group was a site of "historical, archeological, scientific, or educational interest."   TEX. NAT.

RES. CODE ANN. § 191.092(a).  The Monument group was of historic interest, because it concerned the Civil War, a historic event; the Monument group was of educational interest, because it was erected to educate the public about the Civil War; and the Monument group is of archeological interest, because it has a time capsule in the base that was set in 1899.  Exhibit K. Defendants claim that no time capsule exists, even in their motion for summary judgment.  (ECF. No. 54 at 16).  However, independent inspection located the time capsule in defendants' possession along with the Travis Park Monument and cannon.   Exhibit K.   The inspector discovered the time capsule in a box cleverly labeled TIME CAPSULE.  The time capsule is an archeological relic protected under Texas law from disturbance without a prior permit from the THC.   TEX. NAT. RES. CODE ANN. § 191.092(a). Defendants violated provisions of the Texas Antiquities Code, and plaintiff Brewer has standing to sue to enforce these provisions.

30.    Plaintiffs have adequately pled standing for enforcement of their interests in the public charitable gifts and incorporate their earlier arguments by reference.  (ECF No. 44 at 29-39).  Defendants misreport the nature of cases plaintiffs cite on this issue.  *Connecticut College v. United States* concerns a public charitable gift made to the government and rendered impossible subsequent to acceptance by the government donee.  276 F.2d 491 (D.C. Cir 1960).   *Connecticut College* does not concern a public charitable trust, as defendants allege.  (ECF No. 54 at 15-16).

31.    The cannon were a gift to defendants, as evidence in plaintiffs' first amended complaint.  (ECF No. 14-1 at 8-9).  Defendants had in their possession and provided in discovery a newspaper article from June 3, 1908.  "As the Confederate Monument association is not incorporated, the war department will present the cannon to the city."  Exhibit L.  Defendants made a material misrepresentation of fact, when they asserted that "the only evidence [of a gift of cannon to the City of San Antonio] is a recitation in Plaintiffs' own alleged records that cannon were gifted to the City 'for the benefit of the confederate camp'" (ECF No. 54 at 15).  The other evidence that the cannon were a gift to defendants was in defendants' own hands, unknown to plaintiffs until disclosed in discovery, and now provided for the record.

32.    Genuine issues of material fact exist on all of plaintiffs' claims, and the Court, therefore, should not grant summary judgment.  Fed. R. Civ. P. 56.

## PRAYER

33.    For these reasons, plaintiffs ask that the Court do the following:

    a.    DENY Defendants' Motion for Summary Judgment,

    b.    RULE that Plaintiffs have standing on all claims, and

    c.    Grant any other relief the Court deems appropriate.

Respectfully submitted this 13th day of August 2018.

s/ David D. Vandenberg
Texas Bar No. 24107948
Vandenberg Law, PLLC
3603D Las Colinas Drive
Austin, Texas 78731
Tel. (512) 373-8694
davidvandenberg@hotmail.com

## CERTIFICATE OF SERVICE

I certify that on August 13, 2018, a copy of Plaintiffs' Response to Defendants' Motion for Summary Judgment was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following attorney in charge for defendants, Ron Nirenberg, et al.

Deborah Lynn Klein
Office of the City Attorney
100 West Houston Street, 18th Floor
San Antonio, Texas 78205
Tel. (210) 207-8919
FAX (210) 207-4357
Deborah.Klein@sanantonio.gov

s/  David D. Vandenberg